SOUTHERN INDIANA GAS AND ELECTRIC COMPANY, THE CITY OF EVANSVILLE *v.* INDIANA INSURANCE COMPANY, CLIFFORD GRASSMAN, VICTOR GRASSMAN

[No. 1-278A44. Filed December 19, 1978.]

506

*Robert H. Hahn, Bamberger, Foreman, Oswald and Hahn,* of Evansville

for appellant gas and electric company. *Timothy R. Dodd, John C. Cox*, of Evansville, for appellant City of Evansville.

*Robert E. Rheinlander, Trockman & Flynn, P.C.*, of Evansville, for appellees.

## STATEMENT OF THE CASE

LOWDERMILK, J. — Defendants-appellants Southern Indiana Gas and Electric Company (Southern) and the City of Evansville (City) appeal after a jury awarded $19,850 to plaintiffs-appellees Indiana Insurance Company (Indiana) and Clifford Grassman and Victor Grassman (the Grassmans).

## FACTS

The home of the Grassmans, located in Evansville, was destroyed by an explosion and fire which occurred December 19, 1972. Indiana paid the Grassmans a total of $16,650 for their loss. The Grassmans and Indiana brought suit against Southern, which had a gas line located in front of the Grassmans' home, and against City, which had a sewer line and a water line located in front of the Grassmans' house. The jury returned a verdict in favor of Indiana and the Grassmans and awarded damages in the amount of $19,850 against Southern and City.

## ISSUES[1]

1. Is the evidence insufficient to support the judgment because Indiana failed to introduce into evidence its policy of insurance with the Grassmans?

2. Did the trial court err when it gave instructions on the doctrine of *res ipsa loquitur?*

3. Did the trial court err when it read Instruction No. 6, dealing with the duty of Southern to inspect its lines and investigate any dangerous condition?

---

1. City has merely incorporated Southern's arguments by reference. Accordingly, we address the arguments solely as presented by Southern.

4.  Is the evidence sufficient to sustain the award of $19,850 as damages?

5.  Did the trial court err in admitting certain evidence?

### DISCUSSION AND DECISION

*Issue One*

Southern states its first issue as follows:

"Whether an insurance company may recover a judgment against a tortfeasor merely on proof of payment to its insured without evidence of the terms of the insurance policy and its obligation to pay."

Southern argues that

". . . any right of Indiana of subrogation must be predicated upon an obligation to pay the Grassmans. Inasmuch as the policy was never produced there is no evidence in the record that Indiana had an obligation to pay."

In support of its argument Southern cites *Home Owners' Loan Corp. v. Henson* (1940), 217 Ind. 554, 29 N.E.2d 873; *National Mutual Insurance Co. v. Maryland Casualty Co.* (1963), 136 Ind.App. 35, 187 N.E.2d 575; *Kamarata v. Hayes Freight Lines, Inc.* (1952), 123 Ind.App. 222, 108 N.E.2d 723. In general, these three cases are authority for the proposition that a person who, without obligation or compulsion, makes a voluntary payment to or on behalf of another person is not entitled to subrogation. Southern insists that "[a]n insurance company cannot recover where it has paid a loss absent proof of the contract and its obligation to pay." In support of its contention Southern cites *Security Insurance Co. v. Mangan* (1968), 250 Md. 241, 242 A.2d 482.

Having carefully read the opinion in *Security Insurance, supra*, we must conclude that the case on which Southern relies provides little support for its argument.

The Maryland court recognized "subrogation by assignment." In footnote number seven, at page 485 of 242 A.2d, the Maryland court wrote:

"In our view, it would be preferable to regard subrogation by assignment as a form of conventional subrogation since *recovery*

*is based on the assignment.* Cf. Alexander v. Fidelity & Deposit Co., 108 Md. 541, 70 A. 209 (1908)." (Our emphasis)

A proof of loss was introduced into evidence in the case at bar. That proof of loss, signed by the insureds, includes the following paragraph:

"In consideration of and to the extent of said payment, the undersigned hereby assigns and transfers to the said company [Indiana], all rights, claims, demands, and interests which the undersigned may have against any party through the occurrence of such loss. and authorizes said company to sue, compromise or settle, in the name of the undersigned or otherwise, all such claims and to execute and sign releases and acquittances in the name of the undersigned." (Our insertion)

Accordingly, the evidence in the case at bar would seem to satisfy the Maryland court in *Security Insurance Co. v. Mangan, supra.* More importantly, the evidence satisfies the Indiana court. In *Employers' Fire Insurance Co. v. Consolidated Garage & Sales Co.* (1927), 85 Ind.App. 674, 155 N.E. 533, the insurance company paid the insured for damage caused to an automobile and took an assignment from insured of his right of action against the tortfeasor to recover the amount of damages paid by insurance company. At 85 Ind.App. 688 appears the following statement:

"Whether the insurance policy issued by appellant covered the loss of the automobile was a question for appellant and the owner of the automobile to settle. With that question, appellee is not interested and has nothing to say . . . Indeed, it was not necessary for appellant to allege or prove the issuance of the policy of insurance or the payment of the loss to the insured. The only facts appellant was required to allege and prove were facts showing a cause of action in favor of the insured and an assignment of such cause of action to appellant. If the cause of action was founded on the equitable doctrine of substitution or subrogation, the rule would be different." (Citations omitted)

Indiana proved facts showing a cause of action in favor of the insureds and the assignment of such cause of action to Indiana to the extent of the payment made by Indiana to the Grassmans. Indiana had no obligation to introduce the insurance policy into evidence.

*Issue Two*

Southern contends that the trial court committed reversible error when it read to the jury two instructions on the doctrine of *res ipsa loquitur*.[2]

Southern objected to the instructions for the following reasons: (1) the evidence shows that the area where the various utility lines were located was not under the exclusive control of Southern; (2) the instructions imply that Southern and City shared joint control of the gas, water, and sewer lines; (3) no evidence was introduced to create an inference that a gas explosion does not occur in the absence of negligence.

In W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 39 (4th ed. 1971), appear the following statements:

"It is never enough for the plaintiff to prove merely that he has been injured by the negligence of someone unidentified. Even though there is beyond all possible doubt negligence in the air, it is still necessary to bring it home to the defendant. On this too the plaintiff has the burden of proof by a preponderance of the evidence;

---

2. Instruction No. 7 reads as follows:

"There is a doctrine in law called res ipsa loquitur which may come into effect under certain conditions in a negligence case. In order for the doctrine to apply, you must find that the following facts existed at the time of the occurrence in question:

First:    That the plaintiff was (damaged) as a proximate result of the occurrence.

Second:    That the instrumentality causing the (damage) was under the exclusive control of the defendants.

Third:    That the occurrence was of a sort which usually does not occur in the absence of negligence on the part of the parties in control."

Instruction No. 8 reads as follows:

"In this case if you find that:

First:    The plaintiff was (damaged) as a proximate result of the gas explosion.

Second:    That the gas mains, sewer lines and water pipes were under the exclusive control of the defendants and

Third:    That the gas explosion was of such a nature that it usually would not occur in the absence of negligence on the part of the defendants, then you may infer that the defendants were negligent in the case in arriving at your verdict."

and in any case where it is clear that it is at least equally probable that the negligence was that of another, the court must direct the jury that the plaintiff has not proved his case. The injury must either be traced to a specific instrumentality of cause for which the defendant was responsible or it must be shown that he was responsible for all reasonably probable causes to which the accident could be attributed. . . .

\* \* \*

This element usually is stated as meaning that the defendant must be in 'exclusive control' of the instrumentality which has caused the accident. . . ." (Footnotes omitted)

Prosser offers the following warning concerning "control":

". . . 'Control,' if it is not to be pernicious and misleading, must be a very flexible term. *It must be enough that the defendant has the right or power of control, and the opportunity to exercise it,* as in the case of an owner who is present while another is driving his car, or a landowner who permits visitors to come on his premises. *It is enough that he is under a duty which he cannot delegate to another,* as in the case of a surgeon who allows a nurse to count the sponges. . . ." (Footnotes omitted; our emphasis)

Regarding multiple defendants, Prosser explains:

"Some quite intricate questions arise where the plaintiff proceeds against two or more defendants. Unless there is vicarious liability *or shared control,* the logical rule usually is applied, that the plaintiff does not make out a preponderant case against either of two defendants by showing merely that he has been injured by the negligence of one or the other. . . ." (Footnotes omitted; our emphasis)

Both Southern and Indiana discuss the case of *Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill.2d 446, 207 N.E.2d 305. Metz brought suit against Gas Company for damage to the Metz home caused by a gas explosion. In 1948 Gas Company installed a gas main along the south side of the street on which Metz resided. In 1955 City installed a water main along the north side of the street and ran a water service pipe under the street and gas main, to a shutoff valve in front of the residence of Metz. Metz hired a contractor to install a service pipe between the

shutoff valve and his home. The residence was destroyed by the gas explosion March 18, 1962. Investigation revealed that the explosion was caused by gas which leaked from the main as a result of a break in the gas main at the point near its intersection with the water service pipe.

Gas Company argued against the applicability of the doctrine of *res ipsa loquitur* because the gas main was located under a public street and because the area had been disturbed in 1955 by the installation of the water system. The Supreme Court of Illinois held, however, that the element of control was present.

> ". . . The usual requirement that the accident-causing instrumentality must be under the exclusive control of the defendant doesn't mean actual physical control at the time of the accident, if the instrumentality or dangerous agency is one which it is defendant's responsibility to maintain at all times and which responsibility cannot be delegated by consent, agreement or usage. (McCleod v. Nel-Co Corp., 350 Ill.App. 216, 112 N.E.2d 501; Cobb v. Marshall Field & Co., 22 Ill.App.2d 143, 159 N.E.2d 520.) In the present case the defendant owned and installed the main in question and was solely responsible for its maintenance. . . ."[3]

The Illinois court then went on to explain:

> "Gas is a dangerous commodity, and the corporation which undertakes to furnish such service must exercise a degree of care commensurate to the danger which it is its duty to avoid and must use every reasonable precaution in guarding against injury to the person or property of others. . . . In the ordinary course of things gas explosions will not occur. When one does occur, an inference of fault is justifiable. Even though the gas company may in a particular instance be blameless, yet we believe that in view of its superior knowledge of the facts at hand and its responsibility to the community, it has the duty to come forward and make explanation. This is no more than the doctrine of *res ipsa loquitur* requires. . . ."[4]

In the case at bar, the witnesses of all parties were in general agreement that good utility practice required that (1) intersecting services should be separated to avoid contact with one another and possible damage; (2) insulation and bracing should be used to prevent contact

---

3. 207 N.E.2d 305 at p. 307. See also *Phillips v. Delaware Power & Light Co.* (1964), 57 Del. 466, 202 A.2d 131.

4. 207 N.E.2d 305 at p. 308.

when services were in close proximity to one another; (3) mains should be laid on solid fill to avoid stress; and (4) a utility should monitor and inspect the work to see that its lines are protected and properly restored whenever services are uncovered by a third party.

We are concerned here with multiple defendants. This situation presents intricate questions, as Prosser noted. Unfortunately, the parties have provided careful analysis of the doctrine of *res ipsa loquitur* in general but have ignored the more specific issue of its application to multiple defendants.

Southern and City each possessed the right or power of control and the opportunity to execute it over their respective utility lines. At the same time, Southern and City shared the use of and control over the area in which their lines were located.[5] Both Southern and City were obligated to conform to the accepted practices of utilities, as set forth previously in this opinion. Both Southern and City had a duty to provide proper insulation and bracing in order to separate lines in close proximity to one another. Both Southern and City, in providing utility services, assumed the duty to inspect whenever their services were uncovered by a third party.

All witnesses who testified concerning the issue agreed that the gas line and water lines were in physical contact, that they were not separated by insulation or bracing, and that the proximity of the lines constituted bad practice.

Plaintiffs' expert witness testified that the fracture of the gas pipe was caused by soil subsidence, improper back fill, the pressure of the water lines on the gas main, and weakness at the thread of the gas line coupling. He further testified that if the soil had not subsided, the break in the main would not have occurred.[6] Southern's superintendent of con-

---

5. Southern refers to testimony that the telephone company had access to the area also. No reference is made to evidence suggesting that the telephone company was in any way involved in activities near the area referred to in the case at bar. A witness also referred to possible interference with the liens by private contractors. The witness admitted, however, that the utility companies exercised control over access to the lines.

6. A break in the sewer line immediately below the break in the gas line was suggested as a cause for the soil subsidence. Additionally, testimony indicated that at least some of the gas which entered the Grassmans' residence reached the house by way of the damaged sewer line.

struction and maintenance was in substantial agreement with the opinion of plaintiffs' expert witness as to the cause of the failure.

As noted by the Illinois court in *Metz, supra*, gas explosions do not occur in the ordinary course of events.[7] In view of Southern's and City's superior knowledge of facts[8] and their responsibility to the community, it is not improper to require them to come forward with an explanation.

Having reviewed the specific facts presented in the case at bar, we hold that the trial court did not err in giving the instructions on the doctrine of *res ipsa loquitur*.

*Issue Three*

Southern challenges the propriety of the trial court's reading Instruction No. 6, dealing with the duty of Southern to inspect its lines and investigate any dangerous condition.

Although the evidence suggests that Southern did not have knowledge of the gas leak, the instruction speaks in terms of Southern's knowledge or opportunity to know that its gas line was leaking or otherwise unsafe. Southern ignores the complete wording of the instruction and thereby fails to show that the instruction, when read in its totality, is erroneous.

*Issue Four*

Several challenges are made concerning the sufficiency of the evidence to sustain the award of damages in the amount of $19,850.

A plaintiff bears the burden of proving the amount of damages caused by the wrongful act of defendant(s). *Daly v. Nau* (1975), 167 Ind.App. 541, 339 N.E.2d 71; *General Outdoor Advertising Co. v. LaSalle Realty Corp.* (1966), 141 Ind.App. 247, 218 N.E.2d 141. This court cannot reverse the award of damages if it is sustained by the evidence presented to the trier of fact. In determining whether there is sufficient evidence to support the damages awarded, this court may

---

7. Southern argues that no evidence proves that gas explosions do not occur in the ordinary course of events. Since this element is based upon ordinary experience, the jury could have made its conclusion without evidence on the issue.

8. For example, Southern acknowledged that it maintained inspection records, but Southern could not locate its records for use at trial.

not weigh the evidence or judge the credibility of witnesses. *Gene B. Glick Co. v. Marion Construction Corp.* (1975), 165 Ind.App. 72, 331 N.E.2d 26. An award of damages, however, may not be based upon conjecture, speculation, or guesswork. *Daly v. Nau, supra.*

The parties have raised an issue as to whether or not the evidence proves the fair market value of the Grassmans' home before it sustained injury.

Jerry Layman testified on behalf of the Grassmans and Indiana. He is a claims manager of Indiana and supervised the handling of the Grassmans' claim resulting from the gas explosion. Layman testified that he was familiar with the values of real estate. With regard to the Grassmans' property, Layman stated that he had not seen the Grassmans' residence prior to the time of the gas explosion but he was aware of the type of construction and the size of the Grassmans' home as it existed prior to the explosion.

Layman was then asked:

"Q. Based upon this familiarity, Mr. Layman, did you have an opinion as to the fair market value of this residential structure immediately prior to December 19, 1972?"

After the trial court overruled a trio of objections, Layman responded:

"A. I would place it in the category of $14,000 to $15,000 value, depending upon the lot value."

On cross-examination the following exchange took place:

"Q. In arriving at the value of this real estate, Mr. Layman, which of the three principal appraisal methods did you use?

A. Square footage, primarily.

Q. Well, isn't it true that the three principal approved methods of appraising real estate are the comparable method, the rental income method and the replacement cost method?

A. That's likely true, Mr. Dodd, but *we weren't looking for a sale value*, we were looking for construction costs." (Our emphasis)

Mr. Layman later responded to questioning as follows:

"Q. My question was, you did not make an appraisal of the fair market value of this property but merely —

A.  No, we did not.

＊ ＊ ＊

Q.  But did [you] not make an appraisal of the fair market value?

A.  No."                                    (Our insertion)

"Fair market value" has been defined as ". . . the price at which a willing seller and a willing buyer will trade." *Sikora v. Barney* (1965), 138 Ind.App. 686, 691, 207 N.E.2d 846.

Mr. Layman explicitly stated that he was not looking for sale value and that he did not determine fair market value. Accordingly, his reference to a value of $14,000 to $15,000 cannot be construed as a determination of fair market value. We must hold that the evidence does not prove the fair market value of the real property prior to the injury caused by the gas explosion.

In *General Outdoor Advertising Co. v. LaSalle Realty Corp.* (1966), 141 Ind.App. 247, 265, 218 N.E.2d 141, Judge Hunter set forth certain rules on the issue of damages:

". . . in cases of injury to real estate or to that which has no value separate and apart from the real estate, the proper measure of damages is as follows:    (1) if the injury is permanent, the measure of damages is the market value of the real estate before the injury, less the market value after the injury; (2) if the injury to real estate is not permanent, then the measure of damages is the cost of restoration. . . ."

At page 267 of 141 Ind.App., Judge Hunter arrived at a definition of "permanent injury":

". . . one wherein the cost of restoration exceeds the market value of the building prior to the injury. . . ."

This same case, at 141 Ind.App. 269, includes an explanation concerning the burden of proving the proper measure of damages:

". . . Where the plaintiff submits only evidence of the cost of restoration, it is incumbent on the defendant to show that the 'before and after' test is less. . . . It must be assumed that when the appellee submitted repair costs, it considered the building to be repairable and not permanently damaged. There is testimony to this effect in the record. Indeed it would seem strange to require a party to carry the burden of proof as to a fact which might be adverse to his cause. Consequently, if the appellant was of the opinion that

the building was permanently damaged, the burden was on it to demonstrate such and failing to do so, the appellant has waived this question. . . ." (Citations omitted)

The Grassmans and Indiana contend that they proved the cost of restoration.

Clifford Grassman testified that Indiana paid the Grassmans $9,000 initially to apply on the cost of reconstructing their home. When the work was 80% completed, Indiana paid an additional $1,700. He also testified that the Grassmans suffered an expense of $2,946.88, not covered by insurance, "to rebuild the house, to refurnish it, and replenish our personal belongings." Mr. Grassman was not able to explain what portion of the $2,946.85 was attributable to each of the three categories of expense.

This evidence sustains an award of damages in the amount of $10,700 for injury caused the real property. The evidence leaves to pure speculation as to what portion of the $2,946.88 was spent on restoration of the real property; therefore, an award in an amount greater than $10,700 for damages to real property is not supported by the evidence.

Southern and City argue that the evidence leads only to a conclusion that the property was totally destroyed; therefore, no recovery should be allowed for cost of restoration. Parenthetically, we note that the evidence was in conflict as to whether or not the Grassmans' home was totally destroyed. Some witnesses spoke in terms of its total destruction, but the Grassmans stated that portions of the former structure were used when work on the home was commenced after the explosion.

Pursuant to the case of *General Outdoor Advertising Co. v. LaSalle Realty Corp., supra,* we must hold that Southern and City had the burden of proving the before and after market value if they considered the injury to be permanent. They failed to meet that burden.

In support of the award for damages to personal property, the Grassmans and Indiana direct our attention to the following evidence:   statement that the fire damaged the furniture; testimony that all of the Grassmans' belongings were in the house, including a gas range, gas furnace, gas water heater, and electric refrigerator; photographs showing debris after the explosion and fire; testimony that

Indiana paid the Grassmans a total of $16,650 for their loss, $5,500 of which was for furnishings and personal belongings; testimony that the Grassmans were able to salvage only a small percentage of the items in the house; testimony that the Grassmans' loss exceeded the limitations of their insurance policy by $2,946.88; and a statement by Indiana's claims manager that the Grassmans suffered losses exceeding the policy limitations by $2,500-$3,000.

With respect to the measure of damages for wearing apparel and household goods, the Grassmans and Indiana rely upon the case of *Anchor Stove & Furniture Co. v. Blackwood* (1941), 109 Ind.App. 357, 35 N.E.2d 117.

In that case, at 109 Ind.App. 363, Judge Bedwell explained:

"Fair market value is not a proper standard for the measurement of the value of used wearing apparel or household goods. It is generally held that the amount of recovery for the loss, or conversion of, or injury to wearing apparel or household goods is not limited to the price which could be realized by a sale in the market, but that the owner may recover the value of the goods to him, based on his actual money loss resulting from his being deprived of the property, or the difference in actual value caused by the injury, excluding any fanciful or sentimental values which he might place upon them...."

In the case at bar, however, Indiana and the Grassmans proved, at best, the cost of replacement. *Anchor, supra,* does not recognize such a measure of damages. In particular, we look to the following statement at 109 Ind.App. 363:

"In determining the value of used wearing apparel or household goods, it is proper to consider any fact which goes to show the real value, such as the cost, and condition and age, and any damage that has resulted to them through use, decay or otherwise...."

The Grassmans and Indiana totally failed to provide evidence of the cost, condition, and age of the wearing apparel and household goods. Their evidence provides only a general impression of the debris left from the explosion and fire, and a summary of the cost of replacement. A plaintiff might recover his full cost of replacing destroyed clothing and household goods if he replaced those items with clothing and household furnishings of the same kind, age, and condition as those items destroyed.

A plaintiff who suffers loss of clothing and household goods cannot recover the unadjusted cost of replacing those articles with new ones.[9]

The following statement in the brief of Indiana and the Grassmans causes this court particular consternation:

"Insurance payments are admissible to prove the value of the Grassmans' personal belongings and household goods based on their actual money loss that resulted from their being deprived of such property. *Anchor Stove & Furniture Co., supra.*" *Anchor, supra,* includes no reference whatsoever to insurance payments.

Although we find no Indiana case precisely on point, Appleman summarizes the holdings in courts of various other states on the issue of the amount recoverable, in general, from the tortfeasor, when an insurer has made payment to the insured. We quote from 6A J. APPLEMAN, INSURANCE LAW AND PRACTICE § 4103, at 382 (1972):

"An agreement between an insured and his insurer as to extent of the insurer's liability to the insured under the contract does not delineate absolutely the extent of the legal liability of a tortfeasor to the insured. And the measure of a tort-feasor's liability to an insurer was held to be the actual value of the destroyed property at the time of the loss, and not the value stated in the policy. Similarly, the fair market value or the fair cash value of the property destroyed, at the time and place of its destruction, or the difference between the market value immediately before the property was damaged and the market value thereafter, in the event of a partial loss, is the measure of damages, whether equal to or in excess of the sum paid by the insurer. . . ." (Footnotes omitted)

The evidence proves beyond a doubt that damage was caused the personal property of the Grassmans. Indiana and the Grassmans left the jury with the task of guessing the amount of the damages, however. This court cannot affirm an award of damages based upon conjecture, speculation, and guesswork. *Daly v. Nau, supra.* Indiana and the Grassmans failed to provide evidence upon which the jury could com-

---

9. See *Phillips v. Delaware Power & Light Co.* (1964), 57 Del. 428, 201 A.2d 160; Annot., 34 A.L.R.3d 816 (1970).

pute an award of damages for injury to the wearing apparel and household furnishings.

The Grassmans sought $2,000 for inconvenience caused them by the explosion. In support of an award of $2,000 the Grassmans direct attention to the following testimony:

"Q. Did you suffer any inconvenience?

A. Quite a bit of inconvenience. Of course, we were without a house for three months; we had very, very few clothes to wear, and plus the fact that I spent a whole lot of time in that three months period getting that place rebuilt and refurnished by running all over the country buying furniture and stuff. And we were inconvenienced quite a bit living in that apartment.

\* \* \*

Q. All right, sir. And on what do you base this claim—you specified that you had actual uninsured damages of $2946.88 and on what do you base this claim for an additional $2,000.00?

A. Well, like I said before, the inconvenience of being without a home for three months, we had very little clothing, and I spent a whole lot of time in that three month period getting that place rebuilt and furnished.

\* \* \*

Q. Is any compensation or payment allowed to the policyowner for any personal time expended by that policyowner for inconvenience other than the actual living expense allowance?

A. No."

Essentially, these statements amount to a conclusion by the Grassmans that they should receive $2,000 because they were inconvenienced "quite a bit" living in an apartment for three months and they spent "a whole lot of time" getting their home rebuilt and furnished. If the Grassmans desired compensation, they could have testified as to such things as the number of hours devoted to the tasks, the number of miles traveled, or the nature of the inconvenience caused them by living in an apartment rather than their home. The statements upon which the Grassmans rely provide no basis whatsoever for a jury to determine whether an award of $2,000 or $200 would be proper. We appreciate the fact that the damages could not necessarily be proved

with detailed accuracy. Descriptions such as "quite a bit" and "a whole lot of time," however, leave the jury with guesswork and speculation. The evidence does not support an award for inconvenience.

The Grassmans and Indiana had sought $450 as the reasonable rental value of the home for the three-month period during which the Grassmans were deprived of the use of their home. Southern contends that *no evidence was presented to establish fair rental value*. Various witnesses provided descriptions of the Grassmans' home as it existed prior to the time of the explosion. The jury reasonably could have determined that the house had a fair rental value of $150 per month.

In summary, Indiana and the Grassmans proved damages of $10,700 for restoring the house and $450 as the fair rental value of the house for three months. We hold that the evidence supports an award of $11,150.

*Issue Five*

Southern and City challenge the admissibility of certain evidence concerning payments made by Indiana to the Grassmans and losses sustained by the Grassmans beyond the amount of insurance coverage. This evidence was introduced with the apparent belief that the values as determined by the insurance company and the insureds constituted proof of damages assessable against a tortfeasor. As discussed in Issue Four, the values placed upon the property in dealings between the insurance company and the insureds are not determinative of damages when suit is brought against a tortfeasor. At least some of the evidence challenged goes to the issue of the amount of the claim assigned to Indiana by the Grassmans. In light of our holding in Issue Four, we find no prejudice caused Southern and City.

We hereby remand this cause to the trial court for modification of its judgment, awarding the plaintiffs a judgment in the amount supported by the evidence presented at trial, $11,170. When the judgment is modified in compliance with this remand the judgment of the trial court will be in all things affirmed.

Lybrook, P.J. and Robertson, J. concur.

NOTE — Reported at 383 N.E.2d 387.