Julio CAMPINS, Jr., et al., Appellants
(Defendants Below),

v.

John CAPELS and Dana Capels,
Appellees (Plaintiffs Below).

No. 4–283 A 60.

Court of Appeals of Indiana,
Fourth District.

March 28, 1984.

Rehearing Denied May 23, 1984.

Richard L. Zweig, Indianapolis, for appellants.

Linda M. Wagoner, Forrest B. Bowman, Jr., Bowman, Dillon & Wagoner, Indianapolis, for appellees.

MILLER, Judge.

Julio Campins, Jr. brings his appeal to this court after John Capels and his wife, Dana, recovered $11,100 in their suit against him, individually, and as his two business entities, Hollywood Gold and Silver and Zeboné Gallery, Jewelry & Coin. The Capelses sued under IND.CODE 34–4–30–1, which authorized them to sue for treble damages because they were victims of a criminal offense against property—they suffered a burglary and consequent theft of their jewelry. The trial court ruled Campins liable for the value of some of their jewelry because he had purchased and had then destroyed some pieces when he know or should have known they were stolen. This being the offense of criminal mischief, the trial court awarded the Capelses treble damages. Campins principally attacks individual portions of the trial court's findings of fact and conclusions of law, but our ultimate decision, broadly stated, is that said findings and conclusions amply and correctly support the court's legal result. However, the award itself must be modified slightly. We affirm and so modify and additionally remand for hearing on appellate attorney fees.

### ISSUES

Campins's issues, trimmed to their essential elements, are:

1. Whether the trial court erred in determining Campins liable to the Capelses under IC 34–4–30–1, i.e. did the preponderance of the evidence show him liable for criminal mischief?

2. Whether, if Campins is indeed liable, the trial court granted excessive damages.

## FACTS

Sometime between January 11 and January 13, 1981, one Earl Hall, eighteen years old, stole various items of jewelry from the Capelses' home (for which he was later convicted). Upon discovery of the loss, the Capelses issued flyers, describing the missing jewelry and offering a reward for its return, and contacted various gold and silver dealers where the items might have been sold by Hall. On January 15 or 16, in the course of the search, Mrs. Capels spoke with Campins, sole proprietor of two such dealerships. She claims he admitted purchasing some of the Capelses' jewelry but told her he had already melted it down with the exception of a sterling silver ring which he returned to her. Upon Campins's refusal to make restitution for the destruction of the jewelry, the Capelses brought suit against him. In their two-count amended complaint (consolidation of two separate suits) the Capelses alleged that various pieces of jewelry had been destroyed at Zeboné Gallery and at Hollywood Gold and Silver and requested treble damages, contending Campins had intentionally destroyed their property with knowledge it was stolen.

At trial, the nucleus of the action revolved around the jewelry allegedly melted down at Zeboné Gallery, particularly three national racing championship rings awarded by United States Auto Club (USAC) and a free-form wedding band with twelve diamonds. (Little testimony was elicited regarding jewelry destroyed at Hollywood Gold and Silver, and the court issued no judgment upon that count.) In support of the Capelses' allegations that Campins did indeed destroy these particular rings with culpability required for liability, Mrs. Capels testified without objection that the thief, Hall, stated he had actually sold her wedding ring to Zeboné Gallery. This is in addition to her testimony, recited above, of Campins's actual admission of possession. Campins himself stated he had seen USAC rings when he sorted through his acquisitions for melt-down and introduced a receipt for $251, made out by an employee of Zeboné Gallery and issued to Earl Hall on January 11, for three 10K gold rings, one 14K gold band, and the sterling silver ring returned to Mrs. Capels. In fact, at one point in the transcript of the trial, we find Campins as much as admitted having bought the jewelry:

"Q. The first time that you did talk to [Mrs. Capels], what, what was your conversation?

A. I had told her that unfortunately the rings had been melted and I was very sorry...."

Record, pp. 98–99.

Testimony was also presented to substantiate the claim that Campins knew or should have known that the rings he destroyed were stolen. The Capelses rely heavily on the evidence that despite the fact Campins had had his secondhand dealers license for almost five months prior to this incident, he failed to abide by municipal ordinances regulating certain practices of such dealers. In particular, one ordinance requires dealers to hold intact each purchased item for at least ten days after the date of purchase. Here, Campins kept the rings for, at most, five days. Record, p. 124. These dealers are also required to keep a record book, chronicling each purchase, and separate cards for each item, said cards to be turned in to the police every Friday. *Id.* The book and the cards are specifically directed at accurate identification of both the purchased articles and the seller, requiring such things as:

"[a]n accurate description of the article received; the amount of money paid for it; the exact time of the transaction; and the name, residence address, telephone number, age, color, height, weight, complexion, style of beard or mustache, any visible distinguishing marks, style of dress, and the number of any license badge of the person delivering the goods to the licensee."

*Id.* The cards were also to display the right thumbprint of the seller. During direct examination, Campins explained he required only the information on a driver's license to make sure the customer was "of

age," and that in fact, after he had received his summons, he had had to add additional information to his copies of the receipts given to Hall in order to more accurately characterize the rings by something other than "10K," "14K," and "s/s." He claimed to be ignorant of the subject ordinances and refused to ask for further data from his customers for fear of "violating their rights." However, he did testify to being aware of certain, select requirements of "city laws" to which he adhered, despite his professed ignorance of the ordinances themselves—driver's license, records, proscription from purchasing from minor. He also admitted the police had found stolen goods at his businesses before this incident. His attitude in response to further questioning was: "As long as we had a second-hand dealer's license, that was all that we were worried about." Record, p. 106.

In this same vein, Capels testified his three USAC rings very clearly exhibited the name of the recipient on their faces: "P. Jones" (Parnelli Jones) on one and "J. Capels" on the other two. Neither name matched that of the eighteen-year-old seller, Earl Hall, who was not even old enough to hold a driver's license when any of the rings were awarded. Campins, in fact, stated he specifically noticed the USAC rings because they looked like class rings with different emblems. However, he further declared he did not examine the rings and thus failed to see the names near those "different emblems," as evidently his employee, who initially purchased the rings, similarly failed to do.

After presenting evidence of Campins's liability, the Capelses presented evidence of the value of their rings. Mrs. Capels's wedding band, having been recently appraised at $700, was easily valuated. The USAC rings, for which the Capelses had requested $350 apiece in their complaint, proved a different matter.

The three USAC rings at issue here had been awarded to Capels in 1972, 1977, and 1978. (He had won five in all.) Each ring signified a national championship earned in a particular automobile category and given to the car's owner and the driver. In 1972, Parnelli Jones gave Capels his owner's ring in appreciation for his work as chief mechanic of Jones's Indy car. Capels later won his 1977 and 1978 rings as the actual owner of championship dirt division cars, driven by Bill Vukovich and Pancho Carter. The 1972 ring signified Capels's work as supervisor of what the media labelled a "super team" after having been instrumental in winning three straight Indy car championships (1970, 1971, 1972). As for his own owner's rings, they represented the large financial investment as well as time required to excel in any division of USAC competition. Sentimentally, Capels described these rings as being enduring symbols of his accomplishments and USAC's recognition thereof. Throughout his testimony, his feelings for these rings were apparent:

"I, it's the one thing that you can lean back on in your past and say, 'Well, I did this' and it's something you'd like to keep, you know, it may be something that your heirs won't want anything to do with, it may be something that collectors may want...."

Record, p. 21.

"I paid for them in blood or sweat, more or less....

"To me, those rings had a value of being presented before many people at an awards banquet for an accomplishment at the time, and they were personal artifacts, and I would never ever feel the same if I just went down and hired somebody to replace my rings for me."

Record, p. 30.

"Made me feel real well, it meant, it meant that I felt like that at one time, I was good enough to have been the champion mechanic, and I was proud of it."

Record, p. 31. There was also more concrete evidence for use in affixing monetary values to the rings.

Each heavy, gold ring bore a synthetic stone and had been molded to display the USAC emblem, the name of the recipient, the specific achievement being rewarded,

and the year of that achievement. They were custom-made annually by Josten's with a different design each year. Capels specifically testified there was no market for these rings: "You can't buy these rings from any gift shop or jewelry store or anything." Record, p. 26. Capels admitted that in 1977, he purchased a duplicate of his 1977 ring for a business associate for $349, and Campins himself testified the price of gold at the time of the theft was double that of at least 1979, from $300 to $580–$600. Capels went on to testify he would not have sold the rings, even for $1,500 or $2,000 apiece. He then estimated their worth as between $700 and $1000, finally settling on $750 when asked to be specific.

In his assessment of the case, the trial judge concluded the following:

## "FINDINGS OF FACTS

\* \* \* \* \* \*

4. At all times material herein Plaintiffs were the lawful owners of certain items of jewelry, such being three (3) United States Auto Club (USAC) award rings and one (1) gold freeform design wedding band with twelve (12) diamonds;

5. On or about January 11, 1981, said items of jewelry were unlawfully removed from Plaintiffs' home without Plaintiffs' knowledge, consent or authorization by Earl Hall, a nineteen (19) [sic] year old male;

6. On or about January 11, 1981, said items of jewelry were sold by one Earl Hall to Defendant for Two Hundred Fifty ($250.00) Dollars;

7. On or about January 13, 1981, Defendant Julio C. Campins, Jr., destroyed said items of jewelry during the process of recovering their gold content in the course of his business;

8. At all times material herein there was in full force and effect a municipal ordinance, *to-wit:* Indianapolis Code, Section 17–460, Retention of Acquired Property, which was at all times material herein as follows:

"All property received by a licensee under this article shall be held intact by the licensee for at least ten (10) days after the article is purchased...."

9. On or about January 13, 1981, with due diligence Plaintiffs contacted gold and silver dealers in the area and circulated among dealers in gold and silver descriptions of items of jewelry stolen earlier from Plaintiffs' home;

10. Defendant's failure to comply with provisions of Indianapolis Code Section 17–460 prevented recovery of the three USAC award rings and one freeform design wedding band by Plaintiffs;

11. At or before the time of destruction of said items of jewelry by Defendant, Defendant knew or should have known that said items of jewelry were stolen property because:

A. The USAC award rings were unique and Defendant acknowledged the peculiar design and weight of the rings attracted his attention;

B. The USAC award rings were custom engraved and/or embossed with the names 'P. Jones' and/or 'J. Capels';

C. Defendant acknowledged that as a long-term resident of Indianapolis, Indiana he was familiar with automobile racing, drivers, events and racing memorabilia and recognized the name 'P. Jones' to be Parnelli Jones, a name well known among racing fans;

D. The seller of said rings to Defendant was a nineteen [sic] year old male named Earl Hall who furnished his name as Earl Hall at the time of the sale of the rings to Defendant;

E. Neither Defendant nor his agents or employees questioned Earl Hall as to his ownership of the three (3) USAC award rings or the free-design wedding band, and Defendant acknowledged it is his policy to refrain from questioning potential sellers as to the ownership of items they desire to sell; and

F. Neither Defendant nor his agent or employees made any attempt to locate the lawful owners of the rings even after they became aware of the unique nature of the rings;

12. At the time of their destruction by Defendant each of the USAC award rings was worth One Thousand ($1,000) Dollars.

13. At the time of its destruction by Defendant the free-form design wedding band with twelve diamonds was worth Seven Hundred ($700) Dollars;

14. There existed at all times material herein a statute of the State of Indiana, such being Indiana· Code 34–4–30. . . .

### CONCLUSIONS OF LAW

1. The law is with Plaintiffs and against Defendant.

2. Defendant was at all times material herein bound by the provisions of Indiana Code Section 17–460, Retention of Acquired Property;

3. Defendant is liable to Plaintiffs for the value of the three USAC award rings and one free-design wedding band, such value being as of the time of the destruction of the rings, and under provisions of Indiana Code 34–4–30–1 Defendant is liable to Plaintiffs for treble damages. Computation of damages is as follows:

| | | |
|---|---|---|
| 3 USAC award rings at $1,000 each | = | $3,000 |
| 1 Free design wedding band at $700 each | = | 700 |
| TOTAL | · | $3,700 |
| Application of Treble Damages | | X  3 |
| TOTAL | | $11,100. |

4. If necessary to support the judgment herein, any of the above conclusions of law shall be deemed Findings of Fact and any of the stated Findings of Fact may be deemed Conclusions of Law.

### JUDGMENT

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that ·Plaintiffs recover from Defendant the sum of Eleven Thousand One Hundred Dollars ($11,100) plus costs of this action."

Record, p. 153 (Emphasis added.)

### DECISION

■ One preliminary topic must be cleared up before proceeding further with this case, and that is the matter of the erroneous judgment. The Capelses sought damages on two individual counts, involving different stolen items sold to different businesses, but judgment was issued upon only one. The trial court erred in this respect. *See Isler v. Isler,* (1981) Ind.App., 422 N.E.2d 416. However, the Capelses failed to allege such error on cross-appeal, and the error is waived. They are now foreclosed from hereafter alleging they should have recovered on both counts. *See State ex rel. Sacks Brothers Loan Co., Inc. v. DeBard,* (1978) 177 Ind.App. 679, 381 N.E.2d 119; *Haycraft v. Haycraft,* (1978) 176 Ind.App. 211, 375 N.E.2d 252.

*Liability*

■ When findings of fact and conclusions of law are requested by the parties, as occurred here, we will not set aside the judgment premised thereon unless it is clearly erroneous, i.e. unless we are definitely and firmly convinced the trial court committed error. The findings must disclose a valid basis for the legal result reached in the judgment, and evidence at trial must support each of the specific findings, with deference given to the court where such evidence conflicts. *Town of Rome City v. King,* (1983) Ind.App., 450 N.E.2d 72. We will not reweigh the evidence nor reassess the credibility of the witnesses before the court but, rather, will affirm if there is sufficient evidence of probative value to support the decision, viewing the evidence most favorable to the judgment and the reasonable inferences drawn therefrom. *Bird v. Delaware Muncie Metropolitan Plan Commission,* (1981) Ind.App., 416 N.E.2d 482. With this principle firmly grasped, we find the judgment here properly rendered.

■ This suit was brought under the auspices of IC 34–4–30–1, which states:

"If a person suffers a pecuniary loss as a result of a violation of IC 35–43, he may bring civil action against the person who caused the loss for:

(1) an amount equal to three (3) times his actual damages;

(2) the costs of the action; and

(3) a reasonable attorney's fee."

Although not a model of clarity, the court's findings designate the IC 35–43 offense when it states, "At or about the time of destruction of said items of jewelry by [Campins], [Campins] knew or should have known that said items of jewelry were stolen property...." The IC 35–43 offense described here is criminal mischief, found at IND.CODE 35–43–1–2(1) (West 1978) (amended 1983 Ind.Acts, P.L. 326 § 1):

"A person who:

(1) *recklessly*, knowingly, or intentionally damages property of another person without his consent ...

commits criminal mischief, a Class B misdemeanor."

(Emphasis added.) *Moore v. State*, (1981) Ind.App., 427 N.E.2d 1135. This finding most assuredly supports a judgment for treble damages. What we must examine is whether the evidence supports such finding.

■ First of all, a conviction for criminal mischief is not required to find Campins trebly liable. *See James v. Brink & Erb, Inc.*, (1983) Ind.App., 452 N.E.2d 414; *American Leasing Inc. v. Maple*, (1980) Ind.App., 406 N.E.2d 333. Thus, all the Capelses had to do was prove their claim by a preponderance of the evidence, fulfilling the civil standard of review outlined above. *See James v. Brink & Erb, Inc., supra.* The evidence clearly shows that Campins conducted his business in such a manner that his actions in destroying the Capelses' rings can only be considered *reckless*—he knew or should have known Hall had sold him stolen merchandise.

First of all, it is pretty evident Campins did indeed buy the stolen jewelry. Mrs. Capels testified he as much as admitted having had possession of the rings. He himself virtually admitted the same when put on the stand. Other testimony, such as Hall's testimony he sold the wedding ring to Zeboné Gallery and Campins's return to Mrs. Capels of another ring from the same

sale, support that conclusion. There *is* some conflict over the dates of the burglary, the Capelses insisting it was January 13 but the receipt to Hall showing Campins purchased the property, January 11. There was testimony supporting either date, and the trial court's choice of one or the other is entirely up to him so long as there is probative evidence supporting such choice. Regardless, there is plenty of evidence pointing to Campins's purchase of the stolen items, notwithstanding the conflict in testimony over the date of the theft. In the main, the Capelses presented a solid case for showing Campins bought the property.

Similarly, there seems to be little doubt that once in his possession Campins destroyed the rings without the Capelses' consent. The primary contention remains whether the Capelses proved, by a preponderance of the evidence, the second element of criminal mischief—culpability. As the evidence was presented, Campins did recklessly destroy the Capelses' property.

Our criminal code defines the concept of "recklessly":

"[a] person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct."

IND.CODE 35–41–2–2(c). As amplified by the Criminal Law Study Commission,

"recklessness is between the poles of intentionality and negligence. Recklessness is like the former in that the actor is conscious of a forbidden harm, and he realizes that his conduct increases the risk of its occurrence and his actions indicate an attitude of mental indifference to obvious risks. It is a form of intentional harm-doing in that it is volitional in a wrong direction. Recklessness, however, differs from intentionality in that the actor does not seek to attain the harm; rather he believes that the harm will not occur. That he deliberately 'took the risk,' that he thought there

was some increased likelihood of harm, does not alter the basic fact that he believed that no harm would actually be committed."

*See Denman v. State,* (1982) Ind.App., 432 N.E.2d 426; *see also Slusher v. State,* (1982) Ind.App., 437 N.E.2d 97. Succinctly stated, Campins is liable for the reckless destruction of the Capelses' rings if he knew, or should have known from the existing facts, that harm would follow whether he desired it or not. *See, e.g., Hardesty v. State,* (1967) 249 Ind. 518, 231 N.E.2d 510; *Beeman v. State,* (1953) 232 Ind. 683, 115 N.E.2d 919.

Campins's policy of refraining from questioning closely those who sold him jewelry had already resulted in the receipt of stolen goods but no consequent change of policy. His employee's purchase from Hall therefore is directly attributable to a deliberate course of action which could only foster the increased risk of buying stolen items. And one would naturally wish to avoid financial losses engendered by having to return such property to police. Thus, it is easy to understand Campins's haste in destroying his purchases. The ordinances of which Campins professed ignorance (except for certain exceptions) were designed to alleviate these practices. This policy, plus the distinctive anomaly of the eighteen-year-old Hall selling three USAC championship rings embossed with "P. Jones" and "J. Capels" as well as an expensive wedding ring, is sufficient to constitute reckless conduct under a preponderance of the evidence standard. Campins realized or should have realized he was destroying property to which he had no rightful claim. The trial court did not err in establishing Campins's liability for criminal mischief. *See also Shaw's D.B. & L., Inc. v. Fletcher,* (1979) Tex.Civ.App., 580 S.W.2d 91 (pawnship held liable for conversion under similar circumstances).

### Damages

■ The remaining issue, now that liability has been established, is the size of the actual damages which Campins asserts are excessive. Our standard of review in this instance follows:

"In order to justify a reversal on the ground of excessive damages, the amount of damages assessed must appear to be so outrageous as to impress the court as being motivated by passion, prejudice and partiality.... Reversal is not justified, however, if the amount of damages awarded is within the scope of the evidence before the court."

*Ingmire v. Butts,* (1975) 166 Ind.App. 139, 334 N.E.2d 701, 705; *Ertel v. Radio Corp. of America,* (1976) 171 Ind.App. 51, 354 N.E.2d 783. The burden of proving the value of goods destroyed by another is upon the complainant. *Southern Indiana Gas & Electric Co. v. Indiana Insurance Co.,* (1978) 178 Ind.App. 505, 383 N.E.2d 387. The question to be answered, therefore, is whether the evidence the Capelses presented is sufficient to support the trial court's determination the wedding ring was worth $700 and the USAC rings, $1000 each.

■ When personal property is the subject of an award, damages are measured by its fair market value at the time of the loss, fair market value being the price a willing seller will accept from a willing buyer. *Bottoms v. B & M Coal Corp.,* (1980) Ind. App., 405 N.E.2d 82. Such appears to be the measure of worth for the twelve-diamond wedding band, appraised at $700. This assessment has never really been contested by Campins; he mainly questions the value placed on the USAC rings. And to our knowledge, the problems raised in valuating them have never been addressed in Indiana.

Both parties have argued this issue in terms of the methods of valuating used household goods and wearing apparel. Such system would appear appropriate because used household goods and clothing have a greater actual value to their owners than they do on the secondhand market, similar to the problem here, where Capels's feelings about the rings as momentos outstrips his feelings for them as jewelry. Instead of allowing only the fair market

value of secondhand goods, the court determines "the owner may recover the value of the goods to him, based on his actual money loss resulting from his being deprived of the property, or the difference in actual value caused by the injury *excluding any fanciful or sentimental values which he might place on them." Anchor Stove & Furniture Co. v. Blackwood,* (1941) 109 Ind.App. 357, 363, 35 N.E.2d 117, 119 (emphasis added); *Cannon v. Northside Transfer Co.,* (1981) Ind.App., 427 N.E.2d 712; *Southern Indiana Gas & Electric Co. v. Indiana Insurance Co., supra; Aufderheide v. Fulk,* (1916) 64 Ind.App. 149, 112 N.E. 399. And, indeed, this standard is prevalent throughout the diverse jurisdictions. *See, e.g.,* 22 Am.Jur.2d *Damages* § 145 *et seq.* (1965); 25 C.J.S. *Damages* § 88 (1966). We believe that standard is useful but not altogether appropriate to the problem here.

▆▆ First of all, jewelry is neither a household good, *Union Light, Heat & Power Co. v. Heving,* (1933) 250 Ky. 223, 62 S.W.2d 789, nor wearing apparel, *Coffinberry v. Madden,* (1903) 30 Ind.App. 360, 66 N.E. 64. Thus, ordinarily, jewelry is valuated at its fair market value. *Union Light, Heat & Power Co. v. Heving, supra.* However, these USAC rings were not ordinary jewelry and could not be bought and sold in a readily available market. Rather, they were coveted awards and symbols of certain achievements accomplished by very few, such awards not having many willing sellers and therefore no real market.[1] These rings should be valued differently than other jewelry. *Cf., Alfred Atmore Pope Foundation, Inc. v. New York, New Haven & Hartford Railroad Co.,* (1927) 106 Conn. 423, 138 A. 444 (woodlands valuated as to their educational function, not for value as timber). This, therefore, is our starting point—how do we find jewelry's actual value to its owner when it has a high value for its extrinsic content but also

has a primary function and a consequently raised value based on pure sentimentality?

We find a basis for proceeding in the fundamental reasoning behind awarding higher actual values to owners of used household goods and wearing apparel:

"The underlying principle of universal application is that of fair and just compensation for the loss or damage sustained.... Where subordinate rules for the measure of damages [fair market value for personal property] run counter to the paramount rule of fair and just compensation, the former must yield to the principle underlying all such rules."

*Aufderheide v. Fulk,* 112 N.E. at 400. As explained by a federal court,

"Sometimes fair market value cannot ·be determined, or would be inadequate, as when for example, the article destroyed was unique or possessed qualities the special nature of which could only be appreciated by the owner. In such a case additional principles are helpful in determining proper compensation to the injured party."

*United States v. Maryland,* (D.C.Cir.1963) 322 F.2d 1009, 1016, *rev'd on other grounds* (1965) 382 U.S. 158, 86 S.Ct. 304, 15 L.Ed.2d 226; *United States Fidelity & Guaranty Co. v. Davis,* (1966) 3 Ariz.App. 259, 413 P.2d 590; *Florida Public Utilities Co. v. Wester,* (1942) 150 Fla. 378, 7 So.2d 788; *Austin v. Millspaugh & Co.,* (1907) 90 Miss. 354, 43 So. 305; *Groves v. Gray,* (1942) 74 Ohio App. 384, 59 N.E.2d 166; *Railway Express Agency, Inc. v. Baum,* (1952) Tex.Civ.App., 250 S.W.2d 423. Our departure from those household goods cases is because there is a presupposed second-hand market for such belongings and an actual value in their practicality and usefulness to the owner. In this case, the rings have *no* real market value, and their sentimental function increases the actual worth beyond the value of the materials. How can we accomodate this difference?

*McCurdy v. Union Pacific R.R. Co.,* (1966) 68 Wash.2d 457, 413 P.2d 617. This evidentiary requirement thereby distinguishes the subject property from other personal property, even household goods and wearing apparel, which is assumed to have a fair market value.

---

**1.** It is important to note that Capels established the lack of market value as it was his burden to do. *See Jensen v. Chicago & Western Indiana R.R. Co.,* (1981) 94 Ill.App.3d 915, 50 Ill.Dec. 470, 419 N.E.2d 578; *Allis-Chalmers Mfg. Co. v. Board,* (1938) Tex.Civ.App., 118 S.W.2d 996;

The emphasis in the cases where the actual value of the goods exceeded the market value or where there was no market value at all is upon looking at all the circumstances and the available elements of loss in a rational, reasonable fashion. For example, the South Carolina Supreme Court stated, "any method adopted, which is obviously fair, and which duly conserves the rights and interest of the party to be made liable, will satisfy legal requirements." *McCready v. Atlantic Coast Line Railroad Co.*, 212 S.C. 449, 48 S.E.2d 193, 196–97, *cert. denied* (1948) 335 U.S. 827, 69 S.Ct. 53, 93 L.Ed. 381; *Zvolanek v. Bodger Seeds, Ltd.*, (1935) 5 Cal.App.2d 106, 42 P.2d 92; *Jensen v. Chicago & Western Indiana Railroad Co.*, (1981) 94 Ill.App.3d 915, 50 Ill.Dec. 470, 419 N.E.2d 578; *Kearns v. Sparks*, (1956) Ky.App., 296 S.W.2d 731; *Austin v. Millspaugh, supra; MacGregor v. Watts*, (1938) 254 App.Div. 904, 5 N.Y.S.2d 525. We believe the best method to ensure fairness to both parties is to receive a wide range of elements for consideration in the actual value. *See, e.g., Iowa Power & Light Co. v. Board of Water Works Trustees*, (1979) Iowa App., 281 N.W.2d 827; *Eablonski v. Close*, (1924) 70 Mont. 292, 225 P. 129; *Alderete v. Cabello*, (1925) Tex.Civ.App., 278 S.W. 950; *cf. Travelers Indemnity Co. v. Armstrong*, (1982) Ind., 442 N.E.2d 349 (adoption of broad evidence rule in defining the term "actual cash value" appearing in an insurance policy—"every fact and circumstance which would logically tend to a formation of a correct estimate of the loss"); *Ohio Casualty Insurance Co. v. Ramsey*, (1982) Ind.App., 439 N.E.2d 1162. This range of evidence gives the trier of fact sufficient latitude to intelligently determine the amount of damages. Such elements that have been introduced and relied upon are often such typical factors as cost of replacement, original cost, and cost to reproduce. *See, e.g., R.T. Jones Lumber Co. v. Roen Steamship Co.*, (2d Cir.1959) 270 F.2d 456 (original cost); *Ford Motor Co. v. Bradley Transportation Co.*, (6th Cir. 1949) 174 F.2d 192 (cost of reproduction); *Green v. Boston & Lowell Railroad Co.*,

(1880) 128 Mass. 221 (cost of replacement). But our courts and juries have also examined elements of a less prosaic nature, such as the proposed use of woodland for a forestry course (*Alfred Atmore Pope Foundation Inc. v. New York, New Haven & Hartford Railroad Co., supra*), uniqueness (*Lack v. Anderson*, (1946) La.App., 27 So.2d 653), the feelings of the owner (*Harvey v. Wheeler Transfer & Storage Co.*, (1938) 227 Wis. 36, 277 N.W. 627), and the cost to build and decorate a room to match a single painting (*Cherry v. McCutchen*, (1942) 68 Ga.App. 682, 23 S.E.2d 587). We believe that sentimental value, in limited circumstances, is also such a consideration.

When we refer to sentimental value, we do not mean mawkishly emotional or unreasonable attachments to personal property. *See Mieske v. Bartell Drug Co.*, (1979) 92 Wash.2d 40, 593 P.2d 1308. Rather, we are referring to the feelings generated by items of almost purely sentimental value, such as heirlooms (*Brown v. Frontier Theatres, Inc.*, (1963) Tex. 369 S.W.2d 299), family papers and photographs (*Bond v. A.H. Belo Corp.*, (1980) Tex.Civ.App., 602 S.W.2d 105), handicrafts, (*Monahan v. Scott Cleaning Co.*, (1922) Mo.App., 241 S.W. 956), and trophies (*Shaffer v. Honeywell, Inc.*, (1976) S.D., 249 N.W.2d 251). What we are referring to basically are those items *generally* capable of generating sentimental feelings, not just emotions peculiar to the owner. In other words, any owner of these USAC rings would have similar feelings. The most apt analogy to our situation is that of the trophies. In two cases, courts have awarded damages based on the consideration of the "blood, sweat and tears" expended to win these objects. *Mosely v. Sears, Roebuck & Co.*, (1964) La.App., 167 So.2d 408 (tennis trophies); *Shaffer v. Honeywell, Inc., supra* (horse trophies); *see also Monahan v. Scott Cleaning Co., supra* (hand-crocheted bedspread valued by work, labor and time spent). We see no difference in giving special consideration to items such as these and to the three USAC rings, awarded for three years of "blood, sweat and tears" and thus having special sentimental meaning for Capels. The question remains

whether Capels's evidence supported the $3000 award.

Capels testified not only to the actual worth of the rings as mere pieces of custom-embossed gold but also to his emotional attachment to each. He described the pride and gratification he felt upon their ownership and elaborated on the effort required to win them. Actual estimates of their worth—to *him*—ranged from $700 to $1000 each; however, he himself settled upon the $750 figure. Campins alternatively argues each ring was worth $67 (wholesale gold), $135–200 (retail gold), or $349 (replacement in 1977). We believe the evidence justified an award of $750.

■ The essential point is that the actual decision with regard to damages is a question for the trier of fact. *Floyd v. Jay County Rural Electric Membership Corp.* (REMC), (1980) Ind.App., 405 N.E.2d 630; *Kroger Co. v. Beck*, (1978) 176 Ind.App. 202, 375 N.E.2d 640. And in establishing proof of loss, the complainant is less compelled to provide certainty in the *amount* of loss as he is to provide certainty in the actual *fact* of loss. *Floyd v. Jay County REMC, supra; Jerry Alderman Ford Sales, Inc. v. Bailey*, (1972) 154 Ind. App. 632, 291 N.E.2d 92. In addition, no mathematical exactitude is required in assessing damages, and all uncertainties are resolved in favor of the claimant and against the wrongdoer. *Babson Bros. Co. v. Tipstar Corp.*, (1983) Ind.App., 446 N.E.2d 11. Such precepts are essential to keep in mind here because not only are we dealing with a piece of jewelry, but we are also dealing with the computation of a virtually unmeasurable mental process, sentiment. Thus, we are prone to giving greater latitude in the specificity of damages here just as we would in a case demanding an award for mental suffering. In such a case, the elements of the mental suffering are more important to this court than the failure to provide specific evidence of the

actual amount awarded. The greatest scrutiny is given in comparing the elements with the award given to ascertain whether the fact-finder was motivated by prejudice, partiality, passion, or corruption and thereby made an excessive determination. *Kroger Co. v. Beck, supra.*

■ In light of the substantial evidence of the replacement value of the rings, the increase in the price of gold, and Capels's justifiable sentimental feelings, we would see no error in finding damages in the amount of $750 apiece.[2] *See also Bond v. A.H. Belo Corp., supra* (sentimental value of family papers and photographs stipulated as greater than $2,500); *Brown v. Frontier Theatres, Inc., supra* (heirlooms valued in 1963, as high as $666.66 for wedding veil, shoes, point lace collar, $666.66 for key-wound watch, $333.33 for cameo pins, etc.)

However, while we ultimately conclude the court did not act erroneously in allowing an award in excess of the replacement value of the rings (based on the unique circumstances here and special attachment to this property), we can hardly deem it appropriate to fix a value higher than that asserted by the owner. Capels finally settled upon a figure of $750 per ring; the court's award of $1000 apiece could only have been improperly based on speculation. To decide otherwise would be to open a Pandora's box of problems in the computation and proof of actual value. By our decision here, we simply conclude that certain property, by its very nature, has an element of sentiment essential to its existence. In this case, we refer to symbols for achievements of national stature and recognition and the calculation of their actual value. But we must also add the proviso that even for significant awards or mementos we do not intend to permit fanciful speculation as to their worth. We must fashion our remedy within the realm of sensibility, as here, where $750 is only

**2.** It is improper to consider evidence of what a person would not sell an item for. In other words, Capels's statement that he "wouldn't have sold those rings for Fifteen Hundred to Two Thousand Dollars to anybody" could not have been used for purposes of estimating damages. *See Cherry v. McCutchen*, (1941) 65 Ga. App. 301, 16 S.E.2d 167; *Young's Bus Lines, Inc. v. Redmon*, (1931) Tex.Civ.App., 43 S.W.2d 266. Thus, Capels cannot so argue this statement as part of the evidence.

slightly above the established range of replacement values. Such would naturally also be our standard in valuating similar significant awards, such as an Oscar, the Heisman Trophy, or an Olympic medal, where the recipient retains the honor despite the loss of the trophy, such trophy being merely the symbol of the achievement and perhaps replaceable by a surrogate. A certain amount of sentiment is inherent in the value of these objects to the owner, and each case must be based on its own facts. But we must refrain from considering all but reasonable estimates of that element of sentiment. We believe in this case, Capels's $750 figure was just such a reasonable value of each ring with the sentiment included therein. We therefore affirm the judgment but modify the award.

*Attorney Fees*

 The Capelses filed a motion in this court for attorney fees incurred by appellate expenses. The statute under which this suit was brought, IC 34–4–30–1 indeed provides for recovery of

"(2) the costs of the action; and

(3) a reasonable attorney's fee."

By virtue of case law, we believe that this statutory provision for "reasonable" attorney fees encompasses appellate fees. *See Templeton v. Sam Klain & Son, Inc.,* (1981) Ind., 425 N.E.2d 89 (in mechanics lien statute, "reasonable attorneys fees" includes appellate fees). Counsel for the Capelses filed an affidavit of what she believed to be reasonable charges for various duties undertaken to defend this appeal, and Campins has not contested said data. However, we do not find this affidavit to be a "well-documented" amount as described in our opinion in *Parrish v. Terre Haute Savings Bank,* (1982) Ind.App., 438 N.E.2d 1, *transfer pending.* In that case, we upheld a petition for appellate fees, which was supported by affidavits with detailed time sheets and by an affidavit attesting the hourly rate was customary in the com-

munity for similar services. *See Code of Professional Responsibility,* DR 2–106(B)(3); *see also U.S. Aircraft Financing, Inc. v. Jankovich,* (1980) Ind.App., 407 N.E.2d 287. We thus hold counsel for Capelses is entitled to attorney fees on appeal[3] but remand for a hearing where she can present a more detailed accounting of her fees and the reasonableness thereof.

Affirmed, modified, and remanded for hearing on fees.

CONOVER, P.J., and YOUNG, J., concur.

---

3. Contrary to counsel's assertion in her motion for appellate fees, the trial court's judgment includes no award for trial fees. There was only an award for costs. Failure to address this issue on appeal is a waiver thereof. Ind.Rules of Procedure, Appellate Rule 8.3(A)(7); *Indiana Hospital Licensing Council v. Women's Pavilion of South Bend, Inc.,* (1981) Ind.App., 424 N.E.2d 461. Thus, counsel for the Capelses is only entitled to appellate fees from Campins.