**Redith K. SUMMERLOT,**
**Defendant-Appellant,**

v.

**Jack M. SUMMERLOT,**
**Plaintiff-Appellee.**

**No. 1-280A48.**

Court of Appeals of Indiana,
First District.

Aug. 20, 1980.

in *Ives v. Jones,* Civil No. 75–0071–R (E.D. Va.1975)." 406 F.Supp. 16, n.3.

Arnold H. Brames, Brames, Bopp & Haynes, Terre Haute, for defendant-appellant.

B. Michael McCormick, McCormick, Weber & Boswell, Terre Haute, for plaintiff-appellee.

RATLIFF, Judge.

## STATEMENT OF THE CASE

Defendant-appellant Redith K. Summerlot (Redith) appeals from a judgment in favor of her son, plaintiff-appellee Jack Summerlot (Jack), decreeing specific performance of an oral contract to convey real estate made between Jack and his now deceased father Clyde Summerlot (Clyde) and Redith on December 29, 1950.

## FACTS

Because in reviewing questions as to the sufficiency of the evidence to support the trial court's judgment this court looks to the facts most favorable to the appellee, we cull the facts in this case from the appellee's thirty-five comprehensive and detailed Findings of Fact adopted by the court.

Plaintiff-appellee, Jack Summerlot, was born March 11, 1925, the second of five children of Clyde and Redith Summerlot, then tenant farmers in Vigo County near

the Wabash River. In 1941 Clyde and Redith purchased their own place, known as the Penna property, which plaintiff farmed while his father engaged in the feed business. During the 1940's a Summerlot family pattern developed regarding the distribution of farm income and expenses which involved the depositing of monies in the parties' respective accounts and periodic "settlements." The parties split the income fifty-fifty, though there were no written agreements. Both Jack and his mother, however, kept thorough records of the farming transactions for purposes of "settling up."

In 1948 Clyde leased approximately seventy acres of land known as the "railroad property" located across the road from the Penna property. Jack did the major portion of farming here in addition to farming the Penna property and other properties for farmers in the community, the latter on a two-thirds/one-third basis. In December 1950 Jack and his parents decided to purchase the railroad property for $14,500. It consisted of four separate tracts: the Blake tract (15 acres), the Anders tract (15 acres), the Francis tract (10 acres), and the Cook tract (29.6 acres). The agreement found by the court was that Jack

> "would take possession of the 'railroad property,' live on one of the tracts which would be his for staying at home and running the farm operation, and would be credited with any and all over-deposits made by Clyde W. Summerlot and Redith Summerlot from farm income. The total purchase price was $14,500.00. Each of the separate tracts within the railroad property were evaluated and, at such time as it was determined by mathematical computation that Jack Summerlot had paid the sum assigned to each tract, it would become his. Under the agreement, Jack Summerlot was encouraged to make direct payments to the bank on the family farm loan and incur the labor on improvements to the property. Meanwhile, all rental income would be accepted by Clyde and Redith for the purpose of paying on the farm debt, taxes, insurance and the cost of materials for improvements and repairs."

Jack and his wife moved onto the Blake tract early in 1951 exercising ownership as to the entire 70 acres, making improvements thereon, and making payments pursuant to the agreement. In 1959 S & G Excavating Company began removing sand and gravel from a portion of the railroad property eventually netting Clyde and Redith $77,866.34. Jack testified that his father had orally agreed that upon full payment for the railroad property Jack would either be reimbursed for the royalties his father received or be permitted to choose on an acre by acre basis land from the Penna property in exchange for the farm land damaged by the excavations. Jack, however, admittedly relinquished any claim he might have to the Penna property because the parties had failed to discuss the specific land to be transferred of the more than 200 acres in the Penna property. The court found that by the end of 1960 "it was mutually agreed that the plaintiff had paid in full for the railroad property." In the 1960's domestic difficulties developed between Jack and his wife culminating in divorce in 1968. Jack contends that he did not seek conveyance of the railroad property during that time because of the divorce proceedings. Both Jack's and Clyde's testimony from those proceedings were introduced by the defendant in the present case and negate any agreement between the parties other than a tenant farmer relationship. During the 1960's the parties had split equally all soil banks monies received from the farm and made equal deposits until 1968 when Clyde and Redith deposited the entire soil bank check in their account "to be applied toward the balance due on the railroad property." Jack interpreted this as a breakdown of their earlier agreement, made a demand for the conveyance of the real estate, and though he prepared the fields for planting in 1969, terminated his involvement with the farming operation. Plaintiff made several efforts to "settle up" after 1969 and then sought legal advice. He claimed reluctance to bring suit against his mother but felt obliged to do so after he

had been contacted by Martin-Marietta Aggregate Company with an offer to purchase the railroad property and later noticed representatives of that company on the property apparently making a survey of it. The trial to the court involved eight days of testimony and numerous pieces of documentary evidence, swelling the record of proceedings to six volumes, upon which the court based its findings of facts, conclusions of law, and judgment in favor of Jack.

## ISSUES

Redith raises four issues for our consideration:

I. Whether the court erred by admitting evidence in violation of Ind.Code 34–1–14–7, a "Dead Man's Statute."

II. Whether the trial court erred by failing to find that Jack's claim was barred by Ind.Code 34–1–2–3, a general statute of limitations cutting off all actions not commenced within fifteen (15) years.

III. Whether the trial court erred by failing to find that Jack's claim was barred by the equitable doctrine of laches.

IV. Whether the trial court erred in ordering specific performance of an oral contract to convey real estate when there was no evidence to show actual, open, and absolute possession sufficient to take the contract out of the statute of frauds under the doctrine of part performance.

### I. *Dead Man's Statute*

Redith contends that the court erred in admitting Jack's testimony regarding conversations he had with his father prior to his father's death on September 18, 1972, because the testimony violated I.C. 34–1–14–7, one of Indiana's so-called dead man's statutes.[1] On the other hand, Jack argues that the statute is inapplicable because his suit against his mother is not a suit against an heir or devisee of a deceased ancestor. We hold that the court did not err in admitting the testimony complained of.

In applying the dead man's statute it is necessary to look both to the language of the statute, which in this case has given rise to two interpretations, and to the purpose behind it. As in all cases of statutory construction the statute must first be shown to be ambiguous and then the ambiguities must be construed in such a way as to effect the intent of the legislature. *Economy Oil Corp. v. Indiana Department of State Revenue*, (1974) 162 Ind.App. 658, 321 N.E.2d 215. Moreover, since the statute in this case established an exception to the general rule of the competency of parties to testify, it must be construed strictly to "apply only to such cases as the wording of the provisions manifestly intended, and, unless the wording of the particular provision embraces the exception its application will not be extended." 30 I.L.E. *Witnesses* § 41 (1960). *See also Sloan v. Sloan*, (1898) 21 Ind.App. 315, 52 N.E. 413; *Spurgeon v. Olinger*, (1917) 64 Ind.App. 176, 115 N.E. 680.

Indiana Code 34–1–14–7 reads as follows:

"In all suits by or against heirs or devisees, founded on a contract with or demand against the ancestor, to obtain title to, or possession of property, real or personal, of, or in right of, such ancestor, or to affect the same in any manner, neither party to such suit shall be a competent witness as to any matter which occurred prior to the death of the ancestor." [Acts 1881 (Spec.Sess.), ch. 38, § 277, p. 240.]

In order that the statute be applicable, the action must be first and foremost "by or against an heir or devisee as such." 30 I.L.E. *Witnesses* § 43 (1960). Redith, of course, contends that she, as a widow, is an heir of her deceased husband, while Jack insists that Redith cannot be considered an heir of the property which is the subject of this law suit. Neither party argues that Jack is an heir or devisee in this action. Clearly, this suit by a son against his mother for specific performance of a contract for the sale of real estate which she holds in fee could not be a suit *by* an heir, since a living person has no heirs, but could be only a suit

---

1. *See also* I.C. 34–1–14–6 and 10.

*against* an heir. Furthermore, this suit could be brought now only against Redith since only she has legal title to the real estate. Thus, ambiguity in the statute arises in the interpretation of the word "heir" and as to whether or not Redith is an heir for purposes of the statute.

■ Indiana case law holds that I.C. 34–1–14–7 applies where the decedent held the property at the time of death and where the party took title to the property in controversy under either the laws of intestacy as an heir or the will as a devisee or legatee. *Snyder v. Frank*, (1913) 53 Ind.App. 301, 101 N.E. 684. It has also been held that a widow is an "heir" for purposes of the statute if she gains an interest in her spouse's property pursuant either to his will or to the statutes of intestacy. *Peacock v. Albin*, (1872) 39 Ind. 25; *Fitzgerald v. Cox*, (1872) 39 Ind. 84. However, Redith has pointed to no case, and our research revealed none, which has held the survivor of a tenancy by the entireties to be an heir. To the contrary, Jack cites 30 I.L.E. *Witnesses* § 43 which states that the dead man's statute "does not apply where the property comes to the party in a ways other than as an heir or devisee, such as by virtue of an estate by the entirety." The case cited therein for this proposition is *Spurgeon v. Olinger, supra*. *Spurgeon* involved a suit by the father of his deceased daughter against the daughter's husband for real estate which the daughter had purchased in her own and her husband's names as tenants by the entirety with $2,300 entrusted to her by her father to invest in the land and allegedly to hold in trust for him. The son-in-law had no knowledge of the trust agreement. The father recovered and on appeal the judgment was affirmed. The son-in-law raised as error the issue of the dead man's statute. The court responded as follows:

"Whether the instant case falls within the spirit of this section [§ 522, now I.C. 34–1–14–7] depends, in a measure at least, upon the character of the estate held by tenants by entirety, the character of the estate, if any, left by a deceased holder of such an estate, and the nature and source of the estate taken by the survivor. These questions were recently considered by this court, in the case of *Sharpe v. Baker* (1912), 51 Ind.App. 547, 553, 96 N.E. 627, 99 N.E. 44, and in an opinion by Judge Lairy, the court expressed itself as follows: 'On the vesting of an estate by entireties, both tenants, by reason of the unity of their person by marriage, become seized of the whole estate, and neither is seized of any divisible part thereof; and therefore on the death of one, the survivor, *being already seized of the whole*, can acquire no *new or additional interest by virtue* of his survivorship.' (Our italics.) See cases there cited, also *Beddingfield v. Estill* (1906), 118 Tenn. 39, 100 S.W. 108, 9 L.R.A. (N.S.) 640, 11 Ann.Cas. 904; *Johnson v. Lusk* (1868), 6 Cold. (Tenn.) 113, 98 Am.Dec. 445; *Thornton v. Thornton* (1825), 3 Rand. (Va.) 179; *Stuckey v. Keefe's Ex'rs* (1856), 26 Pa. 397. Under these authorities there can be but one conclusion as to the nature, character, and source of the estate of appellant to the land in controversy. He and his deceased wife alike held title to the whole estate in such land from the moment of the execution of their joint deed. Their title comes from the same source—their common grantor. They took but one estate, which by the terms of the grant continued in the survivor, and appellant's estate was not enlarged or added to by the death of his wife, but *her* estate was thereby terminated and extinguished, and his simply freed from her participation therein. She therefore left no estate in said real estate that could descend to him or any of her heirs, and he, through her death, took no new estate in said real estate. The appellee's action can therefore in no way affect any property, real or personal, of Maude Spurgeon. As to such land, neither appellant nor appellee could take it as the heir of Maude, nor is either of them claiming, nor could either of them legally claim or assert, any title or interest in or to said real estate in right of Maude, nor could any estate, real or per-

sonal, if any [were] left by her, be in any way affected by any judgment that might be properly rendered in this action. The action is simply one to have a lien declared and enforced against appellant's land, to the extent of the fund used in its purchase by Maude Spurgeon under the agreement she had with appellee.

"In determining whether said land ought to be subjected to said lien, any evidence tending to show that appellant, when he took title to said land, knew of the trust agreement between his wife and her father, under which the father furnished a part of the purchase money invested therein, was material and proper. Both persons who were to be affected, and whose property rights were to be affected by such agreement, if there were one, were living, and either was competent to testify as to any knowledge he had on said subject. We therefore hold that the evidence of appellee affecting said question was properly admitted. As tending to support this interpretation of § 522 Burns 1914, *supra*, see *Snyder v. Frank* (1912), 53 Ind.App. 301, 101 N.E. 684; *Hitt v. Carr* (1916), 62 Ind.App. 80, 109 N.E. 456. *Taylor v. Duesterberg, Admr.* (1887), 109 Ind. 165, 171, 172, 9 N.E. 907; *Waltz v. Waltz* (1882), 84 Ind. 403, 409."

If Maude's husband (plaintiff's son-in-law) as the survivor of a tenancy by the entireties is not considered an heir for purposes of the dead man's statute when an action is brought against him to foreclose on former entireties property, then neither may we consider Redith an heir in a similar situation. A strict construction of the term "heir," therefore, would not include the surviving tenant of entireties property.

Moreover, the purpose of the dead man's statute itself would not be served by its application to the present case. Prior to the enactment of the dead man's statutes, parties to an action were not competent witnesses for or against each other. Subsequently, the rules were changed and parties were made competent witnesses. In order to protect or preserve decedents' estates from spurious claims or defenses, however, the legislature enacted the narrowly drawn dead man's statutes making parties once again incompetent to testify where the decedent could not. *Peacock v. Albin, supra.* The court in *Peacock* reminds us that I.C. 34–1–14–7 is really a companion statute to Ind.Code 34–1–14–6 and must be read *in pari materia* therewith. Indiana Code 34–1–14–6 states:

"In suits or proceedings in which an executor or administrator is a party, involving matters which occurred during [the] lifetime of the decedent, where a judgment or allowance may be made or rendered for or against the estate represented by such executor or administrator; any person who is a necessary party to the issue or record, whose interest is adverse to such estate, shall not be a competent witness as to such matters against such estate: Provided, however, That in cases where a deposition of such decedent has been taken, or he has previously testified as to the matter, and his testimony or deposition can be used as evidence for such executor or administrator, such adverse party shall be a competent witness for himself, but only as to any matters embraced in such deposition or testimony. [Acts 1881 (Spec.Sess.), ch. 38, § 276, p. 241.]"

The plain and obvious purpose of this statute is to protect the decedent's estate while it is represented by an executor or administrator, but unfortunately affords no protection thereafter if the executor or administrator assigns claims to an heir or legatee. It is for the latter purpose that I.C. 34–1–14–6 was ostensibly enacted. *Peacock v. Albin, supra.*

The narrow construction given the dead man's statutes limiting them to the protection of decedents' estates is reflected in the early case of *Sloan v. Sloan*, 21 Ind.App. at 318, 52 N.E. 413, which held that neither of the statutes applied even where one estate was suing another estate since they were on equal footing. The court there quoted with approval the Indiana Supreme Court in *Durham v. Shannon*, (1888) 116 Ind. 403, 19 N.E. 190:

' "Generally speaking, three things must concur in order to exclude the testimony of the surviving adversely interested party: (1) The transaction, or the subject-matter thereof, must be in some way directly involved in the action or proceeding, and it must appear that one of the parties to the transaction about to be proved is dead. (2) The right of the deceased party must have passed, either by his own act or that of the law, to another, who represents him in the action or proceeding in the character of executor, administrator, or in some other manner in which he is authorized by law to bind the *estate.* (3) It must appear that the allowance to be made, or the judgment to be rendered, may either directly or indirectly affect the *estate of the decedent.*" ' (Emphasis ours.)

██ Thus, the only purpose of the dead man's statutes is to preserve decedents' estates from spurious claims or defenses.[2] If the *estate* of the decedent is not affected, either directly or indirectly, the statute is not intended to apply. It is elementary, of course, that entireties property does not become part of the decedent's estate. Therefore, Redith not being an heir as to entireties property and the entireties property not constituting any part of the deceased ancestor's estate, I.C. 34–1–14–7 does not apply in this case.

## II.  *Statute of Limitations*

██ Both parties agree that Ind.Code 34–1–2–3 is the appropriate Statute of Limitations in the case at bar. Disagreement arises as to when the statute begins to run. Redith argues that it should begin on May 24, 1961, the date on which Jack claims to have made the last payment on the property, and thus that the statute has run. Jack contends that the statute does not commence running until there has been a demand for conveyance. This he claims to have made in 1969 after Redith and Clyde repudiated the contract by failure to split the soil bank money in 1968. His suit was filed July 13, 1976, more than 15 years after the May 1961 date but less than 15 years after 1968 or 1969. Unfortunately, appellant presents no argument or cites no authority on this issue and merely attacks the credibility of the evidence offered to prove final payment. On appeal we do not judge the credibility of witnesses or reweigh evidence. *Robison v. Page*, (1959) 129 Ind. App. 289, 156 N.E.2d 389. Appellant has waived this issue. Ind.Rules of Procedure, Appellate Rule 8.3(A)(7).

## III.  *Laches*

Redith argues that the trial court abused its discretion in not finding Jack's claim barred by the doctrine of laches. Jack states that the applicability of laches is a matter to be determined under the facts and circumstances of each case. As a matter resting within the sound discretion of the trial court, he argues, it should not be interfered with unless it is so clearly erroneous as to constitute an abuse of that discretion. We agree with Jack.

██ As is the case of all equitable doctrines, the applicability of laches to an action is within the sound discretion of the trial court. 71 Am.Jur.2d *Specific Performance* § 95 (1973). The exercise of such discretion is based on informed, rather than arbitrary, considerations in accordance with settled judicial rules and principles of equity. *Id.* § 7. Appellant is correct, therefore, in pointing to certain factors which a court should consider in determining whether or not to invoke the doctrine of laches, such as (1) the claimant's knowledge of his rights, (2) the lapse of time resulting in (3) changed circumstances causing prejudice or injury to the defendant. However, appellant is incorrect in stating that proof of these elements constitutes laches. There is no hard and fast rule as to what constitutes

---

**2.** No other holding explains the numerous "exceptions" to the dead man's statutes. *See e. g., Melloh v. Gladis*, (1974) 261 Ind. 647, 309 N.E.2d 433 (constructive trust exception); *Moster v. Bower*, (1972) 153 Ind.App. 158, 286 N.E.2d 418 (*res gestae exception*); *Jenkins v. Nachand*, (1972) 154 Ind.App. 672, 290 N.E.2d 763 (wrongful death action); *Spurgeon v. Olinger, supra; Sloan v. Sloan, supra.*

laches in a suit for specific performance. *Ryason v. Dunten,* (1905) 164 Ind. 85, 73 N.E. 74. Laches will be applied only where the facts and circumstances of the individual case show inexcusable delay. *Id., Haas v. Holder,* (1941) 218 Ind. 263, 32 N.E.2d 590. There is ample evidence to indicate that the court considered each of the elements suggested by appellant and yet decided that Jack's delay was excusable because of the family habits, customs, and relationships.

On appeal where the evidence is conflicting and an abuse of the trial court's discretion is alleged, we shall consider only the evidence most favorable to the judgment and all reasonable inferences to be drawn therefrom. *McMahan Construction Co. v. Wegehoft Brothers, Inc.,* (1976) Ind. App., 354 N.E.2d 278. An abuse of discretion will be found only where the court's conclusion and judgment is an erroneous one, "one clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *McFarlan v. Fowler Bank City Trust Co.,* (1938) 214 Ind. 10, 14, 12 N.E.2d 752, 754; *see also, Elder v. City of Jeffersonville,* (1975) 164 Ind.App. 422, 329 N.E.2d 654; *Captain & Co., Inc. v. Towne,* (1980) Ind. App., 404 N.E.2d 1159. Where the court finds that the delay was excusable because of the family habits, customs, and relationships involved, and the evidence and inferences therefrom support the finding, we may not as a matter of law hold to the contrary.

## IV. *Part Performance*

Redith contends that the court erred as a matter of law in ordering specific performance of an oral contract for the sale of real estate because Jack "did not have actual, open or absolute possession of the real estate *sufficient* to satisfy the doctrine of Part Performance *sufficient* to take the alleged contract out of the Statute of Frauds." (Appellant's Brief, p. 18; our emphasis.) What Redith is really questioning here is the sufficiency of the evidence to support the trial court's findings of fact, *viz.* possession, which constitute part performance. Jack, of course, argues that he met his burden of proving part performance under the contract.

Again, we remind appellant of the standard of review of sufficiency questions where there is conflicting evidence as to an issue. We shall not reweigh the evidence but shall consider only the evidence most favorable to the appellee and all reasonable inferences to be drawn therefrom. Such review will result in reversal only where there is no evidence to support the trial court's finding. *McMahan Construction Co. v. Wegehoft Brothers, Inc., supra.*

It is the general rule that the enforceability of contracts for the sale of real estate depends upon their being in written form. Ind.Code 32–2–1–1. The reason for the statute of frauds is quite simply to preclude fraudulent claims which would probably arise when one person's word is pitted against another's and which would open wide those ubiquitous "floodgates of litigation." Nevertheless, oral contracts for the conveyance of real estate are not void, but voidable. *Dubois County Machine Co. v. Blessinger,* (1971) 149 Ind.App. 594, 274 N.E.2d 279, *appeal after remand* 157 Ind.App. 115, 299 N.E.2d 207. Such parol contracts may be enforced by a court of equity under the doctrine of part performance. Where one party to an oral contract in reliance on that contract has performed his part of the agreement to such an extent that repudiation of the contract would lead to an unjust or fraudulent result, equity will disregard the requirement of a writing and enforce the oral agreement. *Id.; McMahan Construction Co. v. Wegehoft Brothers, Inc., supra; Cutsinger v. Ballard,* (1888) 115 Ind. 93, 17 N.E. 206.

One writer approached a discussion on the doctrine of part performance by saying: "The whole question of the nature of the doctrine that part performance will take an oral contract to sell land out of the statute of frauds can best be described by the word 'chaos.'" 8A Thompson on Real Property *Vendor and Purchaser* § 4463, 359

(1963 Repl.). It is certainly true that the facts which may be held to constitute part performance will vary with each individual case. *Dupont Feedmill Corp. v. Standard Supply Corp.*, (1979) Ind.App., 395 N.E.2d 808; 71 Am.Jur.2d *Specific Performance* § 4 (1973). However, Indiana courts, holding fast to the validity of the rationale behind the statute of frauds, have through the years rather strictly adhered to requiring proof of a combination of three specific elements: payment, possession, and improvements. *Dubois County Machine Co. v. Blessinger, supra.* Redith argues that Jack did not prove, as required by Indiana law, either that he took absolute possession of the entire portion of the railroad property under the contract or that Clyde and she ever yielded such possession to him. She cites as authority *Donnelly v. Fletemeyer*, (1931) 94 Ind.App. 337, 176 N.E. 868, *reh. denied* 179 N.E. 190, *transfer denied.* In *Donnelly* the trial court found that appellee Fletemeyer had at no time been in possession of more than ten acres of the more than twenty-six acres of property involved and that Donnelly had been in possession of the rest. Nevertheless, the trial court decreed specific performance in favor of Fletemeyer as to the whole. On appeal the court held that all the evidence on the subject sustained the trial court's findings and, therefore, that appellee was not entitled to a decree of specific performance as to the whole. In the instant case, on the other hand, the trial court found that Jack was in possession of the entire railroad property, worked on it and made improvements on it, even though he lived only on the Blake tract. Although the evidence as to possession of the whole was conflicting, we must decline appellant's invitation to find her testimony and evidence more convincing than Jack's.

It also should be noted that the "absolute and open possession taken under the contract" is to be defined as such possession as is consistent with the terms of the contract. *Brown v. Freudenberg*, (1938) 106 Ind.App. 692, 17 N.E.2d 865, *transfer denied*; 37 C.J.S. *Statute of Frauds* § 252 (1943). Such possession need not be exclusive. *Jackson v. First National Bank & Trust Co. of La Porte*, (1944) 115 Ind.App. 313, 57 N.E.2d 946, *transfer denied; Brown v. Freudenberg, supra.* As this court stated in *Brown v. Freudenberg* at 106 Ind.App. 700, 17 N.E.2d 868, "where the contract has been fully performed, specific performance should not be denied for the sole reason that the possession taken was not exclusive in the ordinary meaning of the term." We note that the trial court in the case at bar found that Jack had fully performed his part of the bargain.

█ Because there is evidence in the record to support the court's findings of possession, payment, and improvements we hold that the court did not err in ordering specific performance in Jack's favor.

Judgment affirmed.

ROBERTSON, P. J., and NEAL, J., concur.