Phyllis S. GIVEN; Phyllis S. Given, Trustee; and Phyllis S. Given and Gilbert Z. Given, Executors of the Estate of Jay N. Given, Deceased, Appellants-Cross Appellees (Defendants Below),

v.

Thomas S. CAPPAS and Rudolph Val Dawson, Appellees-Cross Appellants (Plaintiffs Below).

No. 3–1084A268.

Court of Appeals of Indiana, Third District.

Dec. 17, 1985.

Rehearing Denied Feb. 7, 1986.

Kirk A. Pinkerton, Roth & Pinkerton Prof. Corp., Highland, for appellants.

James J. Nagy, Munster, for cross-appellants.

James J. Nagy, Munster, for appellees.

Kirk A. Pinkerton, Highland, for cross-appellees.

STATON, Presiding Judge.

In this appeal, we are asked to review a judgment against Phyllis S. Given, Trustee (Mrs. Given) ordering her to transfer one hundred fifty (150) shares of stock to Thomas S. Cappas (Cappas) and Rudolph Val Dawson (Dawson), former law partners of Mrs. Given's late husband, Jay Given (Given). On cross-appeal Cappas and Dawson challenged the trial court's ruling that Mrs. Given's Motion to Correct Errors was timely filed.

Originally Cappas and Dawson filed a claim against Jay Given's estate to recover the stock. That claim was denied and thereafter Cappas and Dawson brought the instant action against Mrs. Given individually, Mrs. Given in her capacity as trustee of the Given children's trust and Mrs. Given and Gilbert Given as co-executor's of Jay Given's estate. On May 22, 1984 the trial court entered judgment upon its findings of fact and conclusions of law. It imposed a constructive trust in favor of Cappas and Dawson upon 150 shares of Bivona Surgical Instruments, Inc., stock held by Mrs. Given as trustee of the children's trust. The court found that the stock (300 shares in all) was an asset of the law partnership of Given, Dawson & Cappas, acquired in part as compensation for legal services rendered and in part by purchase with partnership funds. The court held that Dawson and Cappas were each entitled to twenty-five per cent (25%) or seventy-five (75) shares of the stock in accordance with their designated interests under the partnership agreement. Although Mrs. Given's Motion to Correct Errors was file-stamped July 24, 1984, one day past the sixty (60) day limitation, the trial court, in ruling on Mrs. Given's "Motion to Determine Date of Filing," found that the motion had been filed on July 23, 1984.

The following issues are raised by the parties' appeals:

I. Whether the trial court erred in ruling that Mrs. Given's Motion to Correct Errors was timely filed;

II. Whether the trial court erred in admitting testimony regarding conversations with the decedent, Jay N. Given, in violation of the Indiana Dead Man's Statute;

III. Whether there was sufficient evidence upon all the elements necessary to impose a constructive trust on the stock;

IV. Whether the trial court erred in holding that Phyllis Given was not a bona fide purchaser for value and without notice;

V. Whether Cappas and Dawson's claims are barred by laches;

VI. Whether Cappas and Dawson's claims are waived by failure to assert an interest in the stock during the lifetime of the decedent, Jay Given;

VII. Whether Cappas and Dawson's claims are barred by the statute of limitations.

We affirm.

Jay N. Given and the plaintiffs, Dawson and Cappas, formed their law partnership in the late 1960's. The parties have stipulated that no written partnership agreement was ever executed, but it is undisputed that the partners agreed to a 50%, 25%, 25% split for Given, Dawson and Cappas respectively.

Beginning in 1971 Given and Marshall Goldsmith, an associate of the law firm, became extensively involved in the initial incorporation and operations of Bivona Surgical Instruments, Inc. (Bivona). The trial court found that Given and Goldsmith, as well as other members of the firm, rendered "thousands of hours" of legal and professional services to Bivona over the next several years. Bivona was never billed by the law firm for these services, although the firm maintained a ledger card on Bivona. When Bivona was incorporated, two hundred seventy-five (275) shares of stock were issued to Marshall Gold-

smith, Trustee. The trial court found that this stock was issued in consideration for legal and professional services and was held by Goldsmith as trustee for the use and benefit of the Given, Dawson & Cappas partnership. Goldsmith also received twenty-five (25) shares issued in his individual name. In 1975 Given and Goldsmith arranged to purchase an additional ninety (90) shares of Bivona stock. Given made an initial payment of $10,000.00 and Goldsmith and Given signed a promissory note for $26,000.00 for the balance. No payments were ever made on the note and it was subsequently cancelled with the result that only twenty-five (25) shares were ultimately transferred; again to Marshall Goldsmith, Trustee. Goldsmith left the firm in 1976 and in 1978, at Given's request, he endorsed the stock certificates to Phyllis Given, Trustee of the Given Children's Trust.

Dawson and Cappas claim that the 275 shares of stock were an asset of the partnership, issued by Bovina in lieu of legal fees for services rendered primarily by Given and Goldsmith. They claim that the later 25 shares were purchased with partnership funds and are, likewise, a firm asset.

The controversy centers on whether the stock was payment for legal services rendered by the law firm or whether it was the sole personal property of Jay Given, acquired in an independent business enterprise unrelated to the law firm.

## I.

### Timeliness of the Motion to Correct Errors

We will deal first with Dawson's and Cappas's claim that the court erred in finding Mrs. Given's Motion to Correct Errors timely filed. The record shows that the last day after judgment on which a motion to correct errors could be timely filed was July 23, 1984; however, Mrs. Given's motion was file-stamped July 24, 1984.

Before the court had ruled on the motion to correct errors, Mrs. Given filed a motion denominated "Motion to Determine Date of Filing" accompanied by affidavits by her attorney, his office manager, the clerk and deputy clerk of the court, the court reporter and the court secretary. The affidavits of Mrs. Given's attorney and his office manager state that the motion to correct errors was deposited in the mail on July 20, 1984 with sufficient first-class postage, addressed to the Clerk of the Court and to the trial judge, the Honorable Morton Kanz. Judge Kanz was on vacation in July and during that time and pursuant to orders from the clerk, documents received were not to be file-stamped until they had been delivered to the Judge Pro Tem or to Judge Kanz for minute sheet entry and signature.

Herman Raade, court reporter in Judge Kanz's court, stated in his affidavit that he saw the Given motion to correct errors in the court mail on July 23, but pursuant to the vacation orders he instructed Georgeanne Gentry, Judge Kanz's secretary, to deliver the documents to Judge Kanz. Ms. Gentry's affidavit states that she personally delivered the motion to Judge Kanz on July 23. Judge Kanz signed the motion blank, Gentry returned the motion to the clerk's office the next day, July 24, and it was file-stamped.

Dawson and Cappas contend that the file stamp controls and that, therefore, the motion to correct errors was one day late. Mrs. Given argues that the motion and accompanying documents were, in fact, received by the clerk on or before July 23, 1984 and were, therefore, timely filed regardless of the file-stamp. We agree with Mrs. Given.

Ind.Rules of Procedure, Trial Rule 5(E) specifies the manner in which filing with the court may be accomplished:

"(E) Filing With the Court Defined. The filing of pleadings and papers with the court as required by these rules shall be made by one of the following methods:

(1) Delivering the pleadings or papers to the clerk of the court;

(2) Mailing the papers to the clerk by registered or certified mail return receipt requested; or

(3) If the court so permits, filing the papers with the judge, in which event he shall note thereon the filing date and forthwith transmit them to the office of the clerk.

Filing by registered or certified mail shall be complete upon mailing."

The various affidavits make it clear that the documents mailed to the clerk were the same documents forwarded to Judge Kanz on July 23, giving rise to the inference that the documents were in fact delivered to the clerk of the court, in compliance with TR. 5(E)(1), by no later than July 23. On that basis the motion to correct errors was timely filed in spite of the policy of not immediately file-stamping documents while the judge was on vacation. Moreover, Judge Kanz received the motion to correct errors at his home and signed the motion blank on July 23. He transmitted them, via his secretary, to the clerk the next day. Thus the papers were timely filed with the judge as well. We find no error in the trial court's determination that the motion to correct errors was actually filed on July 23, 1984 and was, therefore, timely.

Having concluded that we have jurisdiction of Mrs. Given's appeal inasmuch as the motion to correct errors was timely filed, we proceed to the merits of the case.

## II.

### Dead Man's Statute

The evidence was sharply conflicting and much of the evidence which supports the trial court's conclusions consisted of testimony relating various conversations between Jay Given and members of the firm concerning the work for Bivona.

Counsel for Mrs. Given made repeated and continuing objections to any testimony concerning conversations of the decedent, arguing that the Indiana Dead Man's Statute, IC 1973 34–1–14–6 (Burns Code Ed.) bars such testimony.[1] The Dead Man's Statute renders a witness incompetent by providing that:

"In suits or proceedings in which an executor or administrator is a party, involving matters which occurred during the lifetime of the decedent, where a judgment or allowance may be made or rendered for or against the estate represented by such executor or administrator; any person who is a necessary party to the issue or record, whose interest is adverse to such estate, shall not be a competent witness as to such matters against such estate."

The purpose of the statute is to prevent false claims against an estate by sealing the lips of a surviving party when the lips of the other party have been sealed by death. *Satterthwaite v. Estate of Satterthwaite* (1981), Ind.App., 420 N.E.2d 287, 289.

The requirements which must be met before a witness is rendered incompetent are:

"a. The action must be one in which an administrator or executor is a party, or one of the parties is acting in the capacity of an administrator or executor;

b. It must involve matters which occurred within and during the lifetime of the decedent;

c. It must be a case in which a judgment or allowance may be made or rendered for or against the estate represented by such executor or administrator;

d. The witness must be a necessary party to the issue and not merely a party to the record;

e. The witness must be adverse to the estate and must testify against the estate."

420 N.E.2d at 289–290.

It is undisputed that requirements a and b are met since Mrs. Given

---

**1.** Counsel also objected on the ground that such testimony was hearsay, but that argument has not been advanced on appeal so we do not address it.

and Gilbert Given were named as defendants in their capacity as co-executors of Given's estate and since the stock transactions undeniably occurred during Given's lifetime. The fact that the executors of the estate are parties, however, does not mean that a judgment or allowance may be made or rendered for or against the estate. The General Assembly, in enacting the Dead Man's Statute for the protection of the assets of an estate and to prevent fraudulent claims did not intend for the statute to prevent testimony which could not in any way affect the estate assets. *Jenkins v. Nachand* (1972), 154 Ind.App. 672, 290 N.E.2d 763, 769. The plaintiffs, Dawson and Cappas, had already filed a claim against the estate which was denied. It is uncontroverted that the stock at issue is held by Phyllis Given *as trustee for the Given Children's Trust.* It is not and never was an asset of Jay Given's estate. The complaint in the instant case requests the court to declare that the stock is held for the plaintiffs and to direct that the stock be conveyed to the plaintiffs. The stock is held and necessarily would be conveyed by Phyllis Given in her capacity as trustee. The judgment that could have been and was, in fact, rendered was against the trust, not the estate of Jay Given. If the assets of the estate can not be affected, the Dead Man's Statute has no application and witnesses may not be rendered incompetent on that basis. *Summerlot v. Summerlot* (1980), Ind.App., 408 N.E.2d 820.

Moreover, the testimony of Marshall Goldsmith and Samuel Goodman could not be rendered incompetent under the statute because they were not parties to the record or parties to the issue. A party to the issue means the parties between whom there is a controversy submitted to the court for trial, the parties who are litigating the particular issue against whom or for whom the court will render judgment. *Satterthwaite, supra* at 290. An interest which would render a witness incompetent is one by which the witness will gain or lose by the direct legal operation of that judgment. *Id.* The interest must be

present, certain and vested, not uncertain remote or contingent. 81 *Am.Jur.2d* Witnesses § 365 p. 377. The fact that the witness may have a similar claim against the estate does not necessarily disqualify him as a witness for another claimant. *Berman v. Druck* (1943), 221 Ind. 241, 47 N.E.2d 142. Here, contrary to Mrs. Given's contentions, Goldsmith and Goodman were not parties to the instant litigation and would gain nothing by a judgment rendered in favor of Dawson and Cappas. There was no evidence that they were making any claim for a portion of the Bivona stock. Only by pure speculation could their testimony be connected to any interest adverse to the estate. Furthermore, as we have already seen, the stock was held, not by the estate, but by the children's trust with Phyllis Given as trustee. The judgment rendered against Phyllis Given, Trustee was not a judgment adverse to the estate. For all of the foregoing reasons, we hold that the Dead Man's Statute is inapplicable to bar any testimony of Dawson, Cappas, Goldsmith or Goodman.

### III.

### Sufficiency of the Evidence

Mrs. Given next argues that there was insufficient evidence upon all the elements necessary to impose a constructive trust. When a trial court makes findings of fact and conclusions of law, this Court will not set aside the resulting judgment unless it is clearly erroneous. *Campins v. Capels* (1984), Ind.App., 461 N.E.2d 712, 717. The evidence at trial must support each of the specific findings, with deference given to the trial court where evidence conflicts, and the findings must disclose a valid basis for the legal result reached. *Id.* We do not reweigh the evidence or judge the credibility of witnesses. *Travis v. Hall* (1982), Ind.App., 431 N.E.2d 519, 520.

"A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to

retain it. The duty to convey the property may rise because it was acquired through fraud, duress, undue influence or mistake, or through a breach of a fiduciary duty, or through the wrongful disposition of another's property. The basis of the constructive trust is the unjust enrichment which would result if the person having the property were permitted to retain it. 5 Scott on Trusts § 404.2."

*Melloh v. Gladis* (1974), 261 Ind. 647, 309 N.E.2d 433, 438–39.

First, Mrs. Given contends the evidence was insufficient to prove that the stock was issued to the partnership in return for legal services. She directs us to the testimony of Dr. Seymour Shapiro, one of the founders of Bivona, who indicated that he sought Jay Given's participation in the company because of his business acumen, not for legal services. In view of the great weight of conflicting evidence, however, the trial court could reasonably have chosen to discount the importance of this particular testimony. It was undisputed that there was a partnership rule against firm members having personal clients and the partners denied ever having given Jay Given permission to treat Bivona as his personal client. On the contrary, in view of the hundreds and possibly thousands of hours spent on Bivona affairs by Given and Goldsmith it is reasonable to infer that the other partners considered Bivona a partnership client. A ledger card was maintained for Bivona as for other clients of the firm. When discussions at partnership meetings turned to the lack of cash flow generated by the work for Bivona, the understanding was that the firm received the stock in lieu of fees. *See* testimony of Goodman, Record p. 122, testimony of Goldsmith, Record p. 147; testimony of Lesniak, Record p. 271, 273; testimony of Dawson, Record p. 429; testimony of Cappas, Record p. 494. In discussing Bivona, Jay Given told his partner, Thomas Cappas, that they were not going to make any money, but their kids would be able to enjoy it. Record p. 498. Given told Dawson the Bivona stock was going to be their

retirement. Record p. 447. No formal trust was ever established but Marshall Goldsmith testified that he understood and believed that the stock was issued in his name as trustee for the benefit of the law firm. On at least two other occasions the law firm had received corporate stock in lieu of fees for legal services performed for clients. Furthermore, in two instances partnership property was held in the names of individual firm members. Cappas and Dawson each held title to certain parcels of real estate on behalf of the partnership. We find ample evidence to support the trial court's determination that the stock was issued to the partnership in exchange for legal services.

Secondly, Mrs. Given argues the evidence was insufficient to prove that the twenty-five (25) shares purchased later were an asset of the partnership. The evidence tended to show that Jay Given withdrew $10,000.00 from partnership funds to make the initial payment on the contemplated ninety (90) share transaction. Although the partners had the ability to draw on partnership funds for personal use, with adjustments made to their capital accounts accordingly, Jay Given told Marshall Goldsmith that the stock was being purchased for the law firm. Given also indicated to Cappas that the firm was buying the additional shares. Record p. 501. Given and Goldsmith signed a promissory note for the balance of the transaction, but no further payments were ever made. The note was cancelled and only twenty-five (25) shares were ultimately transferred. They were issued in the name of Marshall Goldsmith, Trustee. While there was conflicting evidence, we cannot say that the trial court reached a clearly erroneous conclusion in determining that the additional twenty-five (25) shares of Bivona stock were an asset of the partnership, purchased with partnership funds.

Because we agree with the trial court's findings that the stock was issued or acquired on behalf of the partnership in the pursuit of partnership business, we also agree that a fiduciary relationship existed

between Goldsmith and the partners as well as among the three partners themselves. Goldsmith's fiduciary duty arose from his status as trustee of the stock. He owed a duty of loyalty to those for whom he held the stock, i.e. Given, Dawson and Cappas. A. Scott *Abridgement of the Law of Trusts* § 170 (1960). It was not necessary that the partners be specifically aware of Goldsmith's status as trustee; once he accepted the position, it became his duty to administer the trust solely in the interest of the beneficiaries. *Id.*

Among Given, Dawson and Cappas, the relationship of partners is itself fiduciary in nature, requiring each partner to exercise good faith and fair dealing in partnership transactions and toward copartners. *McKinley v. Long* (1949), 222 Ind. 639, 88 N.E.2d 382, 384; IC 1984 23-4-1-21 (Burns Code Repl.). Under the statute

> "(1) Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property."

Since the Bivona stock was acquired in the course of partnership business it follows that the partners were entitled to expect Goldsmith and Given to hold it for their benefit and to account for it. Even if Dr. Shapiro and Jay Given intended the stock to be a personal asset of Given, the evidence is substantial that Given convinced his partners to forego legal fees for the time Given and Goldsmith expended on Bivona by leading them to believe that the stock was compensation for those services. There was ample evidence that the partners would not have consented to a partnership arrangement wherein Jay Given and a paid associate of the firm spent a substantial amount of time on personal business for which the partnership would not be compensated. The fact that Given and Goldsmith sought to acquire an additional ninety (90) shares at a cost of $36,000.00 is certainly some evidence of the value of the stock, and of their attempt to profit from the use of partnership funds in paying for the stock.

Mrs. Given argues that since the majority of the evidence supporting imposition of a constructive trust is parol evidence, it does not meet the high standard of proof required. Essentially this is an invitation for us to reweigh the evidence, which we will not do, but more importantly, we are guided by the pronouncements of our Supreme Court which has declared on more than one occasion that "constructive trusts are creatures of equity, imposed to do justice. As equitable creations, they are not governed by the parol evidence rule, statute of frauds or any other rules of law pertaining to express trusts." *Criss v. Bitzegaio* (1981), Ind., 420 N.E.2d 1221, 1224; *Melloh v. Gladis, supra*, 309 N.E.2d at 440.

Because of the undeniable fiduciary duty owed by Given to his copartners by virtue of their partnership, we deem superfluous Mrs. Given's argument that imposition of a constructive trust requires a showing that Given took advantage of a dominant position over weaker partners. The statute imposes the duty upon a partner irrespective of any position of dominance or superior influence. Similarly, although the trial court found that Jay Given exercised undue influence over Marshall Goldsmith with respect to the shares of Bivona stock, we find it irrelevant to the resolution of the case. The fact is by some means or other Given prevailed upon Goldsmith to abrogate his duty as trustee of partnership property and transfer the stock to Phyllis Given. Whether Goldsmith believed no detriment was suffered by Dawson and Cappas is, likewise, unimportant.

If the fiduciary relationship is found to exist then fraud can be presumed or inferred due to a violation or breach of that relationship. *Hunter v. Hunter* (1972), 152 Ind.App. 365, 283 N.E.2d 775, 779. Moral guilt or actual dishonesty are not essential elements of the constructive fraud necessary for the imposition of a constructive trust. *Brown v. Brown* (1956), 235 Ind. 563, 135 N.E.2d 614, 616. Whether it was

Jay Given or Marshall Goldsmith or both, who breached a fiduciary duty with respect to partnership property the fact remains that the stock was wrongfully transferred to Phyllis Given.

## IV.

### Purchaser for Value Without Notice

■ The question remains whether Phyllis Given may, nevertheless, avoid imposition of the constructive trust because she was an innocent purchaser for value, without notice. A transferree is chargeable as constructive trustee if he had notice of the fraud or if he was a mere donee of the property without notice. *Scott, supra* §§ 456–481. Mrs. Given testified that her husband told her that he had put Bivona stock in her name as trustee of the children's trust, but there was no evidence that she was aware that it was property rightfully belonging to the partnership. She apparently did not see the stock certificates showing the transfer from Marshall Goldsmith, Trustee to Phyllis Given, Trustee until after Given's death. Even if she had seen the certificate bearing Goldsmith's name as trustee, it would not have appeared inconsistent with Given's purported desire not to hold property in his own name. Thus, while we cannot say that Mrs. Given had notice of the fraud, a person is not permitted to profit by the fraud of another, even though she herself was not guilty of fraud. *Id.* "Let the hand receiving the gift be ever so chaste, yet if it comes through a polluted channel, the obligation of restitution will follow it." *Brennan v. Persselli* (1933), 353 Ill. 630, 187 N.E. 820 (quoting Lord Chief Justice Wilmot in 1 Perry on Trusts and Trustees § 211 (7th Ed.)).

The final consideration, then, is whether Mrs. Given was a purchaser for value. The trial court concluded she was not. The stock was transferred by Marshall Goldsmith at the instance of Jay Given. Neither Marshall Goldsmith as trustee or the partners as beneficiaries received any consideration from Jay Given, Phyllis Given or the Given Children's Trust for the transfer of the stock. Mrs. Given and the trust which she administered were mere donees of the Bivona stock. Although the parent child relationship may constitute sufficient consideration to support the transfer of property, *see* 76 Am.Jur.2d Trusts § 275, the fact that Jay Given was instrumental in effecting the transfer does not make him the grantor of the property so that we may impute a meritorious consideration such as love and affection for his children. The trial court did not err in concluding that Mrs. Given was not a bona fide purchaser for value.

## V.

### Laches

■ The application of the equitable doctrine of laches is within the sound discretion of the trial court, based upon informed considerations in accordance with settled judicial rules and principles of equity. *Summerlot v. Summerlot* (1980), Ind. App., 408 N.E.2d 820, 827. The court considers such factors as (1) the claimant's knowledge of his rights (2) an inexcusable delay in asserting those rights resulting in (3) changed circumstances causing prejudice or injury to the defendant. *Id.*

The record is replete with testimony indicating that the partners had no reason to suspect that the stock was not being held as an asset of the partnership. On direct examination Cappas was asked:

"Q. In your conversations with Mr. Given did he ever claim that it was an individual asset separate and apart from the partnership?

A. No.

Q. Did he ever indicate to you that Bivona was a client of his separate and apart from the partnership?

A. No."

Record at 499.

Dawson testified in a similar vein:

"Q. What are you basing your opinion on as to your contention that the partnership was the owner of the stock in question?

A. In my conversations with Jay and with Marshall.

Q. Did Jay Given ever indicate to you at any time that he owned the stock personally?

A. No, he did not.

Q. Did he ever indicate to you that all the work that he was performing for Bivona was being done for him personally?

A. No he did not."

Record at 471–72.

The evidence establishes that Cappas and Dawson did not know that the stock was held by Mrs. Given for the children's trust until after Jay Given's death in May, 1981. The instant action was filed in February, 1982 after their initial claim against the estate was denied. We find no delay in the plaintiff's conduct, moreover Mrs. Given has failed to demonstrate any prejudice as a result of the alleged delay. There was no abuse of discretion in rejecting the defense of laches.

### VI.

### Waiver

■ Mrs. Given's claim that Dawson and Cappas have waived any right to claim the stock by waiting until after the death of her husband is unavailing as her laches argument. Waiver is an intentional relinquishment of a known right, an election by one to forego some advantage he might have insisted upon. *Lafayette Car Wash, Inc. v. Boes* (1972), 258 Ind. 498, 282 N.E.2d 837, 839. Mere silence, acquiescence or inactivity is not waiver unless there was a duty to speak or act. *American Nat. Bank & Trust Co. v. St. Joseph Valley Bank* (1979), 180 Ind.App. 546, 391 N.E.2d 685, 687. There was no evidence whatsoever that Dawson and Cappas intended for Jay Given to expend substantial amounts of professional time at the expense of the partnership. The evidence, in fact, supports the opposite conclusion— that they believed the firm was compensated for its managing partner's services in the form of Bivona stock. They were as-

sured by Given on a number of occasions that while Bivona wasn't generating any cash for the firm, they could count on the stock for the future. Trusting in the assurances of Given, they had no cause to assert a claim to the stock until Given's death necessitated the dissolution of the partnership and a division of partnership assets. At that time Dawson and Cappas learned that the stock was not being held for the benefit of the partnership, but had been transferred to Phyllis Given in trust. Waiver is determined solely by the conduct of the party holding the right, *Indiana State Highway Commission v. Pappas* (1976), 169 Ind.App. 6121, 349 N.E.2d 808, 813, and we find nothing in the conduct of Dawson and Cappas to indicate that they intentionally relinquished their claim to the stock.

### VII.

### Statute of Limitations

■ As Mrs. Given correctly points out, constructive trusts are subject to the six-year statute of limitations for fraud, IC 1973 34–1–2–1 (Burns Code Ed.). *Forth v. Forth* (1980), Ind.App., 409 N.E.2d 641. IC 34–1–2–1 provides that suits for relief from fraud must be commenced within six (6) years of the accrual of the action. The limitations period begins to run from the date the fraud is perpetrated. *Id.* When the cause of action is concealed by the fraudulent party, the statute is tolled until discovery of the fraud or until discovery was possible with due diligence. IC 1973 34–1–2–9 (Burns Code Ed.). Ordinarily the concealment statute will extend a party's time to file suit only when the defrauder actively or intentionally conceals the cause of action, but where there is a fiduciary or confidential relationship giving rise to a duty to disclose material information between the parties, the requirements of affirmative conduct do not apply. *Dotlich v. Dotlich* (1985), Ind.App., 475 N.E.2d 331, 341, *trans. den.* Given had a fiduciary duty as a partner to deal fairly, honestly and openly with Cappas and Dawson. If he intended to keep the Bivona stock for

himself he had a duty to disclose that fact to his partners. The fact that the stock was held by Marshall Goldsmith as trustee would not necessarily inform the partners of Given's claim of exclusive ownership. Other partnership property was also held in the name of individual firm members. Even when Given persuaded Goldsmith to transfer the stock to Mrs. Given, his fiduciary duty to disclose excused his partners of any duty of diligence in discovering the true state of affairs. Therefore, the cause of action regarding the Bivona stock did not accrue until Cappas and Dawson were informed of Given's exclusive claim. Since Given died before disclosing his intentions, the statute did not begin to run until Given's death in 1981. The instant claim, filed in 1982 was, therefore, well within the statute of limitations.

Judgment affirmed.

HOFFMAN, and GARRARD, JJ., concur.