### In re the ADOPTION OF INFANT M.D.

**Marcus McINTYRE, Appellant–Respondent,**

v.

**Gale MEDARIS and Helen Medaris, Appellees–Petitioners.**

**No. 18A05–9207–CV–253.**

Court of Appeals of Indiana, Fifth District.

April 22, 1993.

Transfer Denied June 11, 1993.

David A. Shaheed, Indianapolis, for appellant-respondent.

Steven C. Litz, Monrovia, for appellees-petitioners.

SHARPNACK, Chief Judge.

Marcus McIntyre, Father, appeals from a judgment against him approving the adoption of his daughter, M.D., by Gale and Helen Medaris. We reverse and remand with instructions.

Father raises several issues for our review, but we consider only the dispositive issue of whether a father, who has established paternity and who has not given his consent to adoption, must establish that it is in his child's best interests for the court to grant his motion to contest the adoption.

The procedural history and facts relevant to this appeal are as follows. On February 20, 1991, Mother gave birth to a female child, M.D. On February 22, Mother, who was unwed, signed a consent to M.D.'s adoption, naming McIntyre as M.D.'s father.

On February 25, the prospective adoptive parents, the Medarises, filed several petitions with the Delaware Circuit Court ("the trial court"), one of which was a petition to adopt M.D. and another of which was a request for the court to release custody of M.D. to them pending the final hearing on their adoption petition. On the same day that the Medarises filed their petitions, the trial court awarded temporary custody of M.D. to the Medarises.

On March 12, the Medarises notified the court that they had filed an adoptive homestudy, dated January 8, 1991, with the court.[1] Although the homestudy had been

---

1. Pursuant to I.C. § 31–3–1–4, as soon as a petition for adoption is found to be in proper form, the clerk must forward a copy of the petition to the state department of public welfare, one copy

conducted for a previous unrelated adoption by the Medarises, the Medarises asked that the prior homestudy suffice for M.D.'s adoption proceedings. The court granted the Medarises' request and informed the Delaware County Welfare Department that it need not conduct a "second" homestudy for purposes of M.D.'s adoption. The Department of Public Welfare responded by issuing a letter, dated March 12 and filed with the court on March 28, stating that the department could not recommend this adoption by the Medarises because it was the department's understanding that this adoption would make the sixth child under the age of four to be adopted by the Medarises.

On March 28, Father filed a motion to contest the Medarises' adoption of M.D. In his motion, Father stated that he had just learned of the pending adoption action and that, while he had not yet established paternity, he was an interested party in the adoption proceeding because he was M.D.'s natural father.

On April 15, Father requested that the court appoint a guardian ad litem for M.D. In his petition, Father stated that, due to the estrangement between himself and Mother prior to M.D.'s birth, Father was not present when M.D. was born and had had no opportunity to see her since. Father stated that, due to the adversarial nature of the current adoption proceedings, the Medarises' counsel had refused to allow any visitation between Father and M.D. According to Father, a guardian was needed to protect M.D.'s best interests, to advise the court as to whether or not visitation would be appropriate pending resolution of the adoption proceedings and to supervise such visitation if necessary.

On May 16, Father and Mother entered into an agreement, the terms and conditions of which the Marion Superior Court, Juvenile Division, approved and incorporated into a judgment. In relevant part, the judgment stated:

1. [Mother] is the natural mother of [M.D.], a black female child conceived out-of-wedlock in 1990 and born out of wedlock on the 20th day of February, 1991 in the County of Marion, State of Indiana and born at Wishard Hospital.

2. Marcus Don McIntrye [sic] is the natural father of said child and hereby admits paternity.

3. The parties agree to the issuance of an amended certificate of birth for the child reflecting that petitioner is the father of the child who shall henceforth be known as [M.M.]

4. The father shall have custody of said child and the mother shall have reasonable visitation privileges with said child.

5. Petitioner shall provide medical insurance coverage for said child and all other support and the mother is under no duty or obligation of support.

\* \* \* \* \* \*

### ORDER

The Court being duly advised in the premises now finds that the foregoing agreement should be approved.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED that the terms and conditions of the foregoing entry made the Order of Judgment of the Court.

(Record, pp. 50–51.)

On June 26, the trial court held a hearing and, three weeks later, made several rulings: (1) it denied Father's motion to dismiss based upon alleged inadequate notice;

---

to a qualified agency as set out in I.C. § 31-3-1-3, and one copy to the county department of public welfare if a subsidy is requested. Not more than sixty (60) days from the date of such reference to the appropriate agency or agencies, "the agency or agencies shall submit to the court a written report of its investigation and its recommendation as to the advisability of the adoption, which report and recommendation shall be filed with the adoption proceedings and become a part thereof.... The report shall as far as possible include ... the suitability of the proposed home for the child.... The report shall be summarily considered by the court.... The report and recommendation of the agency or agencies shall not be binding on the court, but shall be advisory only."

(2) it granted Father's motion for an appointment of a guardian for M.D.; and (3) it set the matter of M.D.'s adoption for a final hearing on September 18.

Two months later, on August 21, the Marion Superior Court, Juvenile Division, after hearing oral argument, overruled the Medarises' motion to intervene in the matter of the paternity of M.D.[2] The Marion Superior Court also temporarily modified its earlier agreed judgment entry by ordering that Father "shall not be entitled to custody of [M.D.] until a full evidentiary hearing can be convened," in the Delaware Circuit Court. (Record, p. 119.)

On September 10, Father filed a second motion to dismiss the Medarises' adoption petition. Father argued that he had established his paternity as required and, based upon a simple reading of I.C. § 31–3–1–6.3(c)(1)(B), the trial court had no basis upon which to deny his motion to contest M.D.'s adoption.[3]

Following a hearing, on September 26, the trial court: (1) denied Father's motion to dismiss; (2) denied the Medarises' request to dismiss Father's motion to contest the adoption, based upon Father's failure to establish, or attempt to establish, paternity within thirty (30) days of receiving notice of the adoption proceedings; (3) denied the Medarises' request to certify a question for appeal; (4) determined "that I.C. § 31–3–1–6.3(c)(1) obligates the court to conduct a hearing on Father's motion to contest the adoption, at which Father bears the burden of proof that it would be in the child's best interest that the motion to contest be granted"; (5) accepted "the parties' stipulation that Father has not consented to the pending adoption, either in writing or by implication"; and (6) set the matter for a hearing on November 27, 1991. (Record, pp. 121–122.)

Following the hearing on November 27, the trial court granted the Medarises' petition for adoption. The court issued extensive findings of fact, as well as the following relevant conclusions of law:

(1) [Father] had the burden of proving that it would be in the child's best interest that his motion to contest the adoption be granted.

(2) While the court concludes that there is no reason to believe that [Father] could not be a capable and fit parent of the child, there is similarly no reason to believe that [the Medarises] could not do the same. [Father] has failed to show why it would be in [M.D.'s] best interest that his motion to contest the adoption be granted.

\* \* \* \* \* \*

(5) The law is with [the Medarises] and against [Father].

(Record, pp. 304–305.)

■ Our standard of review here is well-settled. When findings of fact and conclusions of law are requested by the parties, as occurred here, we will not set aside the trial court's judgment unless the judgment is clearly erroneous, that is, unless we are firmly convinced the trial court committed error. *Campins v. Capels* (1984), Ind.App. 461 N.E.2d 712, 714. Because we are firmly convinced that the trial court here erred in its interpretation of I.C. § 31–3–1–6.3, we reverse the trial court's judgment.

In relevant part, I.C. § 31–3–1–6.3 states:

(a) A person contesting an adoption must file a motion to contest the adoption with the court within thirty (30) days after service of notice of the pending adoption.

(b) Whenever a motion to contest an adoption is filed, the court shall, before entering a decree under section 8 of this chapter, set the matter for a hearing to contest the adoption.

(c) After hearing evidence at the hearing, the court shall:

---

**2.** When Father filed a motion to establish his paternity in Marion County, the Medarises entered an appearance, asked for permission to intervene, and filed a motion to vacate the paternity declaration. (Record, p. 330.)

**3.** According to Father's interpretation of I.C. § 31–3–1–6.3(c)(1)(B), after hearing evidence at the hearing to contest the adoption, the court shall dismiss the adoption petition if the court finds that a required consent has not been obtained in writing or has not been implied.

(1) dismiss the adoption petition if the court:

(A) finds that the person who filed the motion to contest the adoption has established that it is in the best interests of the child that the motion to contest the adoption be granted;

(B) finds that a required consent has not been obtained in writing or has [not?] been implied under section 6.1 of this chapter; *or*

(C) permits a necessary consent to be withdrawn; *or*

(2) deny the motion to contest the adoption. (emphasis added)

 Both the "or" following the semicolon in (B) and the "or" following the semicolon in (C) in the above statute are conjunctions, which are used to indicate alternatives and are usually found only before the last term of a series. *See The American Heritage Dictionary of the English Language* 923 (1981). Thus, pursuant to this statute, after a court hears evidence on a motion to contest an adoption, the court shall choose one of two alternatives: (1) dismiss the adoption petition *or* (2) deny the motion to contest the adoption. Three alternatives may provide the basis upon which a court shall dismiss an adoption petition: (1) if the person who filed the motion establishes that it is in the best interests of the child for the court to grant the motion; (2) if a required consent has not been obtained in writing or by implication; *or* (3) if the court permits a necessary consent to be withdrawn.

The record indicates that the trial court interpreted this statute as follows:

"Now [A] stops after the word, granted with a semi-colon. It does not say, or. The next section says, or; [B] says, or; [C] says, or; [A] does not say, or. I think that ... if you're going to dismiss the petition, you have to find [A] *and* [B] *or* [C] ... Then, the court after it's heard the evidence can dismiss the petition if it finds the best interest of the child *and* that the consent was not given or was not implied *or* [C] ... the court allows it to be withdrawn.... [A]fter hearing the evidence at the hearing, the ... question

[becomes] whether ... to comply with (c)(1) if you have to find both [A] and [B] or [A] and [C].... As I'm reading this, ... after the court's heard the evidence you can either do what is provided in [1] or [2]. If you do [1], ... you must first find [A] that it's in the best interest not to allow the adoption *and* you must find [B] that the required consent has not been obtained or has been implied *or* that it was given, but it should be withdrawn. I think there's two things that have to be found if you find [1].

(Record, pp. 414–420.) (emphasis added)

The trial court's erroneous interpretation of this statute was evident in its September 26 determination "that I.C. § 31–3–1–6.3(c)(1) obligates the court to conduct a hearing on Father's motion to contest the adoption, at which Father bears the burden of proof that it would be in the child's best interest that the motion to contest be granted." (Record, p. 121.) We agree with the trial court's determination that this statute requires the trial court to conduct a hearing concerning a motion to contest an adoption. However, since Father, in a timely manner, both established his paternity and contested the adoption, we disagree that he was required to demonstrate it was in the child's best interest not to be adopted. *See In re the Adoption of Baby Boy Dzurovcak* (1990), Ind.App., 556 N.E.2d 951, 952 (if a father can demonstrate that he established paternity in a proceeding other than the adoption proceeding prior to the granting of the adoption petition, he will have the power to veto the adoption).

The Medarises argue that Father was barred from contesting his daughter's adoption because he failed to timely establish, or attempt to establish, his paternity. To support this argument, the Medarises first direct us to *Dzurovcak* for the proposition that a putative father cannot contest an adoption until he has established paternity. *Dzurovcak*, 556 N.E.2d at 951. Next, the Medarises direct us to that portion of I.C. § 31–3–1–6.3 which states "[a] person contesting an adoption must file a motion to contest the adoption with the

court within thirty (30) days after service of the pending adoption." According to the Medarises, these two propositions read together suggest that a putative father must establish, or attempt to establish, his paternity *before* he contests an adoption because, without having first established paternity, a putative father has no standing to contest an adoption. The Medarises' argument lacks merit.

We begin our analysis by disregarding that portion of the Medarises' argument pertaining to a requirement that a putative father attempt to establish his paternity within thirty (30) days of having received notice of a pending adoption. Nothing the *Dzurovcak* court stated in its opinion and nothing set out in the statute may be interpreted as meaning that a putative father cannot contest an adoption unless he has attempted to establish his paternity.

Next, we note that nothing in I.C. § 31-3-1-6.3 explicitly states that a putative father is required to establish his paternity within thirty (30) days of having received notice of a pending adoption petition. The only time limit mentioned in I.C. § 31-3-1-6.3 is the thirty-day requirement concerning the filing of a motion to contest the adoption. Subsection (e) of the statute refers to establishing paternity, but it only states that "[a] putative father is barred from establishing paternity under IC 31-6-6.1 if his motion to contest the adoption has been denied under this section."[4] I.C. § 31-3-1-6.3(e).

Under the Medarises' interpretation, a putative Father must have established his paternity before he may file a motion to contest an adoption. Because a putative father must file a motion to contest an adoption within thirty (30) days of having received notice of a pending adoption, the Medarises would require a putative father to have established his paternity, in a proceeding separate from the adoption proceeding, within a matter of thirty (30) days. Inasmuch as putative fathers have no con-

trol over court calendars, this requirement would not only be absurd but also unenforceable.

In addition, to read into this statute a requirement that a putative father must establish paternity before filing a motion to contest would be inconsistent with that part of the statute which states that a "putative" father is barred from establishing paternity under our paternity statutes if his motion here has been denied. First, a father who must have established his paternity before filing a motion to contest would no longer be considered a "putative" father.[5] Second, under the Medarises' interpretation, this portion of the statute would be rendered meaningless because a father who must have established his paternity before filing a motion to contest would have no need to establish his paternity once his motion to contest had been denied.

For these reasons, we decline to read into I.C. § 31-3-1-6.3 a requirement that a putative father either establish, or attempt to establish, his paternity within thirty (30) days of having received notice of a pending adoption.

■ Because Father had established his paternity in a proceeding other than the adoption proceeding and because both parties had stipulated that Father had not given his consent to the adoption, we hold that the trial court erred by not dismissing the Medarises' petition to adopt. We therefore reverse the trial court's judgment and instruct the court to dismiss the Medarises' petition to adopt M.D.

We now address the separate issue of who should have custody of M.D. When the trial court has dismissed the petition to adopt, it is required by I.C. § 31-3-1-8(e) to "determine who shall have custody of the child," and must conduct a hearing to determine who shall have custody based upon consideration of the best interests of M.D. *In re Adoption of Dzurovcak* (1992),

---

**4.** In most cases, I.C. § 31-6-6.1 affords a putative father two (2) years after the birth of a child to establish paternity.

**5.** A "putative father" is defined as "[t]he alleged or reputed father of a child born out of wedlock." *Black's Law Dictionary* 1237 (6th ed. 1990).

Ind.App., 600 N.E.2d 143, 148. Because the Medarises have had actual physical custody of M.D. for two years, they may be interested parties in the custody hearing. *Id.*

 Father, however, is now favored on the issue of custody. A natural parent enjoys a presumptively superior right over a nonparent to custody of a child, and a third party who seeks to displace a parent as custodian always bears the burden of overcoming the parent's superior right. *Hunt v. Whalen* (1991), Ind.App., 565 N.E.2d 1109, 1111; *In re Custody of McGuire* (1985), Ind.App., 487 N.E.2d 457, 460. In a custody dispute between a parent and a third party, while the child's best interest is of great importance, it is presumed that it is in the child's best interest to be placed in the custody of the parent. *McGuire*, 487 N.E.2d at 460. In our case, it appears that the traditional factors of acquiescence, relinquishment and unfitness have already been addressed. From the record of the adoption hearing, there can be no question that Father has neither acquiesced in nor relinquished care of M.D. As for unfitness, we presume that this is not a factor due to the trial court's conclusion that "there is no reason to believe that [Father] could not be a capable and fit parent of the child...." (Record, p. 304.)

We apply the above authority to our situation and hold that, at the evidentiary hearing to determine who should have custody of M.D., Father, as M.D.'s natural parent, enjoys a presumptively superior right over the Medarises, as nonparents, should they be parties to the custody hearing. If the Medarises do participate, they must overcome Father's superior right to custody.

 A remaining issue not addressed by our adoption statutes, however, is who should have physical custody of M.D. following the dismissal of the Medarises' adoption petition and until the required custody hearing. As we have noted, Father is now presumptively the appropriate person to have custody. For the following reasons, we hold that he is also the person who should have physical custody until the final determination is made.

"[T]he relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection." *Lehr v. Robertson* (1983), 463 U.S. 248, 258, 103 S.Ct. 2985, 2991, 77 L.Ed.2d 614, 624. " '[S]tate intervention to terminate [such a] relationship ... must be accomplished by procedures meeting the requisites of the Due Process Clause.' " *Id.*, citing *Santosky v. Kramer*, (1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599.

"When an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' *Caban v. Mohammed* (1979), 441 U.S. 380, 392, 99 S.Ct. 1760, 1768, 60 L.Ed.2d 297, his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he 'act[s] as a father toward his children.' *Id.* at 389, n. 7, 99 S.Ct., at 1766, n. 7. But the mere existence of a biological link does not merit equivalent constitutional protection.... The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie."

*Lehr v. Robertson*, 463 U.S. at 261–262, 103 S.Ct. at 2993–2994, 77 L.Ed.2d at 626–627.[6]

---

6. Our supreme court recently addressed this case law of the U.S. Supreme Court and stated that a statutory adoption scheme based upon the distinction between unwed fathers who are active parents and those who are not could require consent from the former and not from the latter. *Adoptive Parents of M.L.V. v. Wilkens* (1992), Ind., 598 N.E.2d 1054, 1059. Fearing this would cause litigation of the wrong question in an adoption proceeding, (i.e., how good

Father's interest here in forming a relationship with his daughter is an interest in liberty entitled to constitutional protection. The record before us reveals that Father demonstrated a full commitment to his responsibilities as a parent early on by coming forward as soon as he received notice of M.D.'s pending adoption to contest her adoption, by immediately establishing paternity of M.D., by continuously battling for his paternal rights concerning M.D., and by never consenting, either impliedly or in writing, to the Medarises' adoption of M.D.

The record also reveals that, at trial, the court and Father engaged in the following conversation:

> THE COURT: Marcus, don't get up yet.... You've already given me some sleepless nights. You're probably going to give me some more. I don't feel that you particularly have any rights that I'm here to protect. It's probably because of my age and generation and I have some skepticism towards you because of the fact that you fathered a child and you weren't married and you didn't get married. You have now fathered another child which I hope you get married. But I'm not here for what you would like to do with your child.... I'm going to give you an opportunity to tell me why would it be better for your child for you to raise [her] than these people.
>
> [FATHER]: Well, for the simple fact that I love her and I feel that I've been cheated out of my responsibility....
>
> THE COURT: [T]he thing I want you to tell me [is] why is this baby going to be better off if I determine that [she] should be with you?
>
> [FATHER]: Because I feel that I can raise her up the right way and I can give her what she needs and I can provide her with what she needs.
>
> THE COURT: What does she need that you're going to give her?
>
> [FATHER]: A home, love.
>
> THE COURT: Well, she's going to get a home and love with these people.
>
> [FATHER]: I know, but that's not the issue. That's my flesh and blood right there. And I feel—I've always been taught to take care of what's yours and you know, that's my heart right there.... I have sleepless nights too because I feel that ... if I didn't do this that I wouldn't sleep or nothing because ... that's all I've been thinking about. I love her very much and just for somebody ... to take her away from me, just, you know—
>
> THE COURT: You're undertaking a tremendous obligation. You're asking the court here to give you this child. You're going to have to see that she's taken care of for probably 18 or 20 years. You've got to not only take care of her, you've got to spend your money to see that she has the things she needs, that she's educated.
>
> [FATHER]: I know this. I'm not—look, I'm 21 years old, right?
>
> THE COURT: That's right.
>
> [FATHER]: But most guys would shy away from this ... because they got a whole life to live, but ... I don't feel that way.... [T]his is my child and I love her and I'd do anything to take care of her.

(Record, pp. 559–561.)

Contrary to the trial court's determination, Father did have rights that the trial court was there to protect. Because Father grasped the opportunity to develop a relationship with his child and accepted some measure of responsibility for her future, the trial court denied Father due process of law by divesting him of his parental rights, including his right to custody, without recognizing a presumption in favor of Father, as a fit natural parent, over the Medarises, who were strangers to the child.

---

an unwed father someone has been rather than who was required to consent to the adoption and whether the child should be adopted), the court concluded that such a scheme was not required constitutionally and would not promote our adoption statute's purposes and goals.

*Id.* We do not cite to these cases, therefore, to support the proposition that our adoption statutes should distinguish between active and inactive unwed fathers for purposes of determining whether consent is required in a particular adoption proceeding.

When Father demonstrated by virtue of his biological link, fitness and parental commitment that he had a constitutionally protected interest in his relationship with M.D. of which he had been deprived without his consent and without due process, he was entitled to have the adoption proceedings dismissed and to be vested with, along with other parental rights, custody of M.D.

For the reasons set out above, we remand to the trial court for an evidentiary hearing to determine who should have custody of M.D., with instructions that, until that hearing takes place, Father shall have physical custody of M.D.[7]

**REVERSED AND REMANDED WITH INSTRUCTIONS.**

BARTEAU and MILLER, JJ., concur.

---

**7.** It is unclear from the record whether the trial court considered Father's living arrangements with a woman to be "sexual misconduct" and whether these arrangements affected the court's earlier decision to allow the Medarises to adopt M.D. To the extent that it did, we instruct the trial court on remand that we do not characterize Father's living arrangements as sexual misconduct, and, even if we did, "[i]n order to deprive a parent of the custody of a child because of sexual misconduct, the misconduct must be shown to have an adverse effect upon the welfare of the child"; mere evidence of sexual misconduct alone is not sufficient to deny a parent custody of the child. *Dunlap v. Dunlap* (1985), Ind.App., 475 N.E.2d 723, 726.